**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PAUL RECKTENWALD,

    Petitioner

v.

ISIDRO BACA, et al.,

    Respondents.

Case No.: 3:15-cv-00187-RCJ-CLB

**Order**

**I.    INTRODUCTION**

This case is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Paul Recktenwald, a Nevada prisoner. This case is before this Court for adjudication of the merits of Recktenwald's remaining claims. This Court denies Recktenwald's habeas petition, denies him a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

**II.    BACKGROUND**

The victim, M.H., and her family, which consisted of M.H.'s mother, three sisters and three brothers, lived with Recktenwald from the beginning of 1995 until June 1995 in Pahrump, Nevada. ECF No. 80 at 27. M.H. was placed in foster care in California in June 1995 due to her mother's alcohol abuse and failure to care for her children. *Id.*; *see also* ECF No. 79 at 48. Near

the end of September 1995, when M.H. was fourteen years old, M.H.'s foster father dropped her off at school one morning, but instead of entering the school, M.H. went across the street to call her grandmother. ECF No. 79 at. 51. Recktenwald was waiting for M.H. and told her that he would drive her back to Pahrump to her grandmother's house. *Id.* at 51-52. Instead of going to her grandmother's house, Recktenwald drove M.H. to his house. *Id.* at 53. While M.H. was at Recktenwald's house for approximately a week, he gave her "a lot" of drugs and would not allow her to leave. *Id.* at 54-55, 58, 62, 65. Recktenwald told M.H. that he loved her, that he wanted to marry her, and that he wanted her to have his baby. *Id.* at 56, 57. M.H. testified that Recktenwald had nonconsensual sexual intercourse with her more than once. *Id.* at 60; *see also* ECF No. 79-2 at 16, 20-21, 27 (testimony of Deputy Sheriff Dawn Kelley that M.H. told her the nonconsensual sexual intercourse with Recktenwald happened twice, once on September 28, 1995, and once on September 29, 1995). M.H. was able to escape after calling her grandmother's neighbor. ECF No. 79 at 66.

More than a year later in October 1996, when M.H. was fifteen years old, M.H. ran away from her grandmother's house in Pahrump, Nevada, to be with her mother. *Id.* at 69-70. M.H.'s mother took M.H. with her to Recktenwald's house and later left M.H. there. *Id.* at 70-71. M.H. testified that Recktenwald again had nonconsensual sexual intercourse with her. *Id.* at 71-72; *see also* ECF No. 79-2 at 16-17 (testimony of Deputy Kelley that M.H. told her that she was at Recktenwald's residence for four days, and during that time, Recktenwald had sexual intercourse with her approximately fifteen times, seven or eight of which were nonconsensual). Recktenwald again gave M.H. methamphetamine, would not allow her to leave, and would tell M.H. that he loved her. *Id.* at 73, 77. The police removed M.H. from Recktenwald's residence. *Id.* at 77.

On October 24, 1997, a jury found Recktenwald guilty of seven counts of sexual assault, six counts of statutory sexual seduction, two counts of possession of a controlled substance, and one count of kidnapping. ECF No. 80-2. At sentencing, the state district court set aside the statutory sexual seduction counts as lesser-included offenses of the sexual assault counts. ECF No. 80-11 at 4. On February 10, 1998, the state district court adjudicated Recktenwald a habitual criminal and sentenced him as follows: eight terms of life with the possibility of parole with an additional eight terms of life without the possibility of parole for the habitual offender enhancements and two terms of 12 to 48 months. *Id.* at 25-26; *see also* ECF No. 80-13 at 4-8. The judgment of conviction was filed on February 12, 1998, and the Nevada Supreme Court affirmed the convictions on January 25, 2000. ECF No. 80-13, 81-19. The Nevada Supreme Court denied Recktenwald's petition for rehearing and petition for en banc reconsideration. ECF No. 81-23, 81-28.

On December 6, 2000, Recktenwald, acting in *pro se*, filed a state habeas petition. ECF No. 82. The state district court appointed nine different attorneys to represent Recktenwald. *See* ECF No. 84-1 at 2. On August 11, 2011, almost eleven years after the original petition was filed, Recktenwald filed a counseled, supplemental state habeas petition. ECF No. 83-2. On March 21, 2013, the state district court denied the petition. No. 84-1. On April 10, 2014, the Nevada Supreme Court issued an order of limited remand, directing the state district court to enter an order with specific findings of fact and conclusions of law. ECF No. 84-26. On June 6, 2014, the state district court issued its amended order denying Recktenwald's petition. ECF No. 84-29. On November 3, 2014, the Nevada Supreme Court affirmed the denial of the petition. ECF No. 84-34. The Nevada Supreme Court denied Recktenwald's petition for rehearing and petition for en banc reconsideration. ECF No. 85, 85-5.

Recktenwald, acting in *pro se*, dispatched his federal habeas petition for mailing on or about March 25, 2015. ECF No. 5. The Respondents moved to dismiss Recktenwald's petition on August 27, 2015. ECF No. 35. This Court appointed counsel for Recktenwald and denied the Respondents' motion to dismiss without prejudice to renew on November 9, 2105. ECF No. 67.

Recktenwald filed a counseled, amended federal habeas petition on January 8, 2016. ECF No. 74. The Respondents moved to dismiss the amended petition on February 18, 2016. ECF No. 86. Recktenwald moved for a stay of consideration regarding the motion to dismiss pending his request to file a second-amended petition and moved for leave to file a second-amended petition. ECF No. 87, 94. This Court granted the motion for leave to file a second-amended petition, denied the Respondents' motion to dismiss without prejudice as moot, and denied Recktenwald's motion to stay consideration of the Respondents' motion to dismiss as moot. ECF No. 97.

Recktenwald filed a counseled, second-amended federal habeas petition on September 16, 2016. ECF No. 98. Recktenwald's second-amended petition alleged the following violations of his federal constitutional rights:

1. The state district court allowed in evidence of prior bad acts.
2. The state district court allowed in evidence of inadmissible expert witness testimony and inadmissible hearsay testimony and erroneously excluded his impeachment evidence.
3. The state district court erred in denying his motion to suppress.
4. There was insufficient evidence presented at trial to support a finding of guilt of the charged crimes beyond a reasonable doubt.
5. The State engaged in prosecutorial misconduct.
6. The state district court erred in failing to grant his motion for a new trial based upon instances of juror misconduct.
7. His trial counsel was ineffective:
   A. His trial counsel failed to investigate and present exculpatory testimony from Angelique Marker, Jennifer Hoadley, and Terri Miller.
   B. His trial counsel had failures regarding the testimony of M.H.
   C. His trial counsel failed to effectively challenge Dr. Richitt's testimony.
   D. His trial counsel failed to impeach Charles Moore.

|   |   |   |
|---|---|---|
| | E. | His trial counsel failed to impeach Michael Dunn. |
| | F. | His trial counsel failed to impeach Debra Coleman. |
| | G. | His trial counsel failed to move to exclude the testimony of Linda and Mary Baumgartner. |
| | H. | His trial counsel elicited evidence of his prior convictions in cross-examination. |
| | I. | His trial counsel failed to request a transition jury instruction. |
| | J. | His trial counsel failed to object to the State's improper sentencing argument. |
| | K. | His trial counsel failed to object to the State's closing argument. |
| | L. | His trial counsel failed to seek the dismissal of the indictment and M.H.'s testimony because they did not provide him with adequate notice. |
| 8. | | The State failed to disclose material exculpatory evidence and presented false evidence at trial. |
| 9. | | His appellate counsel failed to raise meritorious issues on appeal. |

The Respondents filed a motion to dismiss Recktenwald's second-amended federal habeas petition. ECF No. 99. This Court granted the motion in part. ECF No. 111. Specifically, this Court dismissed Grounds One, Two, Six, and Nine as procedurally barred; dismissed the Sixth Amendment claim in Ground Five as procedurally barred; dismissed all claims in Ground Eight as procedurally barred, except the claim that the victim told the State that she had lied at the preliminary hearing but the State failed to disclose that evidence and presented false evidence at trial; dismissed Ground Three as non-cognizable; and deferred a decision on the subparts of Ground Seven until the merits disposition. *Id.* at 16-17.

The Respondents filed an answer to the remaining grounds in Recktenwald's second-amended petition on November 20, 2017. ECF No. 113. Recktenwald filed a reply on February 20, 2018. ECF No. 117.

## III. STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a

6

strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*
at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)
(describing the standard as a "difficult to meet" and "highly deferential standard for evaluating
state-court rulings, which demands that state-court decisions be given the benefit of the doubt"
(internal quotation marks and citations omitted)).

## IV.    DISCUSSION

### A.    Ground Four

In Ground Four, Recktenwald argues that his federal constitutional rights were violated
because there was insufficient evidence presented at trial to support the findings of guilt of
sexual assault and kidnapping. ECF No. 98 at 19. Recktenwald asserts that inconsistencies or
contradictions in a witness's testimony may alone be enough to find that insufficient evidence
exists and that there was no physical evidence supporting M.H.'s various stories. *Id.* at 19-20. In
Recktenwald's state direct appeal, the Nevada Supreme Court held:

> Appellant contends that insufficient evidence was presented at trial to support his
> kidnapping and sexual assault convictions. Our standard of review is "'"whether,
> after viewing the evidence in the light most favorable to the prosecution, any
> rational trier of fact could have found the essential elements of the crime beyond a
> reasonable doubt.'"" *Hutchins v. State*, 110 Nev. 103, 107-08, 867 P.2d 1136, 1139
> (1994) (quoting *Koza v. State*, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting
> *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). Appellant's contention focuses on
> credibility issues created by the victim's prior inconsistent statements and
> compounded by questionable corroborating witnesses. We reject this contention
> because "it is for the jury to determine the degree of weight, credibility and
> credence to give to testimony and other trial evidence." *Hutchins v. State*, 110 Nev.
> 103, 109, 867 P.2d 1136, 1140 (1994). Our review of the record on appeal reveals
> sufficient evidence to establish guilt beyond a reasonable doubt. The victim's
> credibility, as well as that of the corroborating witnesses, was assessed by the jury,
> and we decline to question that assessment because appellant has failed to show
> "that no rational juror could have found the existence of the charged offenses
> beyond a reasonable doubt." *Id.*

ECF No. 41-22 at 6-7.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." *See id*. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

M.H., who was fourteen years old in September 1995, testified that she was in foster care in California in September 1995. ECF No. 79 at 47, 51; ECF No. 77-34. M.H.'s foster father dropped her off at school one morning, but instead of entering the school, M.H. went across the street to call her grandmother on the phone. ECF No. 79 at 51. Recktenwald was waiting for her and called her name. *Id.* M.H.'s mother told Recktenwald where M.H. was located. ECF No. 79-1 at 13. Recktenwald told M.H. that he would drive her to Pahrump to her grandmother's house. ECF No. 79 at 52. M.H. got into Recktenwald's car, but instead of going to her grandmother's house, Recktenwald drove M.H. to his house in Pahrump. *Id.* at 53.

While M.H. was at Recktenwald's house for approximately a week, he gave her "a lot" of drugs," and, in fact, she was taking methamphetamines the whole time she was there. *Id.* at 54, 62; ECF No. 79-1 at 16. M.H. wanted to leave Recktenwald's residence during this time, but he would not allow her to leave. ECF No. 79 at 55. "[W]hen [she]'d go to the front door, he'd go to

the front door and he would follow [her] through the house." *Id.* M.H. tried to go out Recktenwald's bedroom window on one occasion, but he pushed her away. *Id.* at 58. Recktenwald also "went outside and got in his car and started ramming his car into his trailer" and "trashed everything" inside his trailer because M.H. attempted to leave. *Id.* at 65.

Recktenwald told M.H. that he loved her, that he wanted to marry her, and that he wanted her to have his baby. *Id.* at 56, 57. M.H. testified that Recktenwald had nonconsensual sexual intercourse with her more than once. *Id.* at 60. M.H. explained that Recktenwald forced himself on her, and she told him to stop and tried to push him off. *Id.* Later, M.H. called her grandmother's neighbor, Benita Harrington, but Recktenwald hung up the phone. *Id.* at 66. M.H. was able to call Harrington again before Recktenwald "ripped the phone out of the wall." *Id.* Harrington picked up M.H. *Id.*

In support of M.H.'s testimony, Harrington testified that she received a telephone call from M.H. in September 1995. ECF No. 79 at 29-30, 37. M.H. told Harrington that she was in trouble, but before M.H. could say where she was located, the phone got disconnected. *Id.* at 30. M.H. called back about five minutes later and said she was at Recktenwald's house. *Id.* Harrington picked M.H. up from Recktenwald's residence, and during the drive back to Harrington's house, M.H. told Harrington that Recktenwald raped her. *Id.* at 31, 33.

Mary Hemphill also confirmed M.H.'s testimony in part. Hemphill testified that she and her boyfriend and two children lived with Recktenwald in September 1995 for a month or two. ECF No. 78-2 at 117-18, 122. Hemphill testified that M.H. and Recktenwald "showed up one night in the middle of the night" from California and that M.H. told her that Recktenwald picked her up in California. *Id.* at 122. Hemphill stated that M.H. stayed with Recktenwald from approximately September 25, 1995, until approximately October 1, 1995. *Id.* at 140-42. Contrary

to M.H.'s testimony, Hemphill explained that M.H. was obsessed with Recktenwald and that before Recktenwald picked M.H. up from California, M.H. would call him "forty times a day on the phone begging him to come get her." *Id.* at 139, 142. Hemphill also explained that M.H. never indicated to her that she did not want to be at Recktenwald's residence. *Id.* at 142, 144.

Gary Wiley, who lived with Recktenwald for about nine months prior to September of 1995, testified that he went to Recktenwald's residence the day after M.H. arrived in September 1995. ECF No. 79-1 at 144-45. Recktenwald told Wiley that "he went and got [M.H.]." *Id.* at 145. Wiley explained that M.H. wanted to leave Recktenwald's residence but Recktenwald "wouldn't let her." ECF No. 79-2 at 2. M.H. also asked Wiley to take her places, but Recktenwald would not let M.H. go with him. *Id.* Recktenwald told Wiley once or twice that he was having sexual intercourse with M.H. *Id.*

Deputy Sheriff Dawn Kelley interviewed M.H. on October 6, 1995. ECF No. 79-2 at 16, 20. M.H. told Deputy Kelley that Recktenwald had nonconsensual sexual intercourse with her twice, once on September 28, 1995, and once on September 29, 1995. *Id.* at 20-21, 27. Lieutenant Anthony Philips interviewed Recktenwald. ECF No. 78-1 at 48-49, 51. Recktenwald told Lieutenant Philips that M.H. showed up at his house on September 25, 1995, and that "he had sex with her two times but it was her idea." *Id.* at 52-53. Recktenwald also told Lieutenant Philips that he knew M.H. was fourteen years old "but he had had sex with her fifteen year old sister and . . . the mother didn't have a problem with it." *Id.* at 53.

More than a year later in October 1996, when M.H. was fifteen years old, M.H. ran away from her grandmother's house in Pahrump to be with her mother. ECF No. 79 at 69-70. M.H. went with her mother and her mother's boyfriend to Recktenwald's house. *Id.* at 70. M.H.'s

mother then left M.H. at Recktenwald's house, and M.H. did not have anywhere to go because she "didn't want to go to [her] grandma's house." *Id.* at 70-71.

M.H. testified that Recktenwald again had nonconsensual sexual intercourse with her. *Id.* at 71-72. M.H. explained that she did not want to have sexual intercourse with Recktenwald, but she "just let him do it" because she "felt he was going to anyway." *Id.* at 72. M.H. also explained that Recktenwald inserted his penis and finger into her vagina on more than one occasion, and, on one occasion, he inserted a glass bottle in her anus. *Id.* at 72-75. Similar to the September 1995 events, during the October 1996 events, Recktenwald gave M.H. methamphetamine, would not let her leave, and "would tell [M.H.] that he didn't want [her] to leave, he wanted [her] to stay with him and that he loved [her]." *Id.* at 73, 77. Thereafter, the police removed M.H. from Recktenwald's residence. *Id.* at 77

Deputy Kelley again interviewed M.H. ECF No. 79-2 at 16-17. M.H. told Deputy Kelley that "she had been at [Recktenwald]'s house for about four days and that he had had sex with her approximately fifteen times" and that "seven or eight of them were nonconsensual." *Id.* at 17. M.H. explained to Deputy Kelley that Recktenwald "would ask her for sex and she would say, 'No,' and he would not listen to her, he'd climb on top of her and have sex anyway." *Id.* at 18. Sergeant Steve Huggins interviewed Recktenwald. ECF No. 79-2 at 49-50. Recktenwald denied that he had sexual intercourse with M.H., denied that he loved M.H., denied the fact that M.H. had seen him naked, and denied saying that he wanted to marry M.H. or have children with her. *Id.* at 50. M.H. was asked to draw a tattoo located on Recktenwald's penis, and her drawing depicted a tattoo that could be seen on a Recktenwald's extended penis. *Id.* at 52-55.

///

///

### 1.      Sexual assault

Nev. Rev. Stat. § 200.366(1), as it appeared at the time of Recktenwald's trial in October 1997, provided that "[a] person who subjects another person to sexual penetration . . . against the victim's will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault." *See* also ECF No. 137-1 at 25. Recktenwald was charged with two counts of sexual assault concerning the September 1995 events and five counts of sexual assault concerning the October 1996 events. *See* ECF No. 77-34.

Regarding the September 1995 events, the evidence admitted at trial demonstrated that Recktenwald had nonconsensual sexual intercourse with M.H., who was fourteen years old at the time, more than once. ECF No. 79 at 60. In fact, M.H. told Deputy Kelley that Recktenwald had nonconsensual sexual intercourse with her once on September 28, 1995, and once on September 29, 1995. ECF No. 79-2 at 20-21, 27. Also, Recktenwald admitted to Lieutenant Philips that "he had sex with [M.H.] two times," ECF No. 78-1 at 52-53, and told Gary Wiley once or twice that he was having sexual intercourse with M.H. ECF No. 79-2 at 2. Because Recktenwald subjected M.H. to sexual penetration against her will on two occasions—once on or about September 28, 1995, and once on or about September 29, 1995—there was sufficient evidence presented at trial to demonstrate that Recktenwald committed two counts of sexual assault. *See In re Winship*, 397 U.S. at 364.

Regarding the October 1996 events, the evidence admitted at trial demonstrated that Recktenwald again had nonconsensual sexual intercourse with M.H. ECF No. 79 at 71-72. M.H. explained that she did not want to have sexual intercourse with Recktenwald but she "just let him do it" because she "felt he was going to anyway." *Id.* at 72. M.H. testified that Recktenwald

inserted his penis and finger into her vagina on more than one occasion, and, on one occasion, he inserted a glass bottle in her anus. *Id.* at 72-75. M.H. told Deputy Kelley that Recktenwald "had sex with her approximately fifteen times" and "seven or eight of them were nonconsensual." ECF No. 79-2 at 17. Because Recktenwald subjected M.H. to sexual penetration against M.H.'s will on at least five occasions during October 1996, there was sufficient evidence presented at trial to demonstrate that Recktenwald committed five additional counts of sexual assault. *See In re Winship*, 397 U.S. at 364.

Although this Court acknowledges that M.H. was inconsistent in her attestations about the consensualness of the sexual encounters during pre-trial proceedings, *see* Ground Eight *infra*, this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved . . . conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 326.

### 2. Kidnapping

Nevada law provides that "a person who leads, takes, entices, or carries away or detains any minor with the intent to keep, imprison, or confine the minor . . . or perpetrate upon the person of the minor any unlawful act is guilty of kidnapping in the first degree." Nev. Rev. Stat. § 200.310(1). Recktenwald was only charged with kidnapping M.H. during the October 1996 events, not the September 1995 events. *See* ECF No. 77-34; ECF No. 137-1 at 11.

The evidence admitted at trial demonstrated that M.H.'s mother left her at Recktenwald's residence in October 1996, when M.H. was fifteen years old. ECF No. 79 at 69-71. M.H. testified that Recktenwald had nonconsensual sexual intercourse with her and would not let her leave. *Id.* at 71-73, 77. M.H. told Deputy Kelley that she was at Recktenwald's residence for four days. ECF No. 79-2 at 17. Because Recktenwald detained M.H., a minor child, with the intent to

confine and sexually assault her, there was sufficient evidence presented at trial to demonstrate that Recktenwald committed first-degree kidnapping. *See In re Winship*, 397 U.S. at 364.

Therefore, in sum, because there was sufficient evidence that Recktenwald committed seven counts of sexual assault and one count of kidnapping, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Four.

### B.     Ground Five

In Ground Five, Recktenwald argues that his federal constitutional rights were violated when the State engaged in prosecutorial misconduct. ECF No. 98 at 20. Recktenwald alleges six instances of prosecutorial misconduct.[1] *See id.* at 20-22. In Recktenwald's direct state appeal, the Nevada Supreme Court held:

> Appellant also contends that the state improperly bolstered the victim's testimony by extensively reviewing her prior consistent statements from the preliminary hearing transcript and asking her to admit they were consistent. Because portions of the statements and transcript were introduced first by appellant, we conclude that the portions admitted by the state were properly admitted under NRS 47.120(1), which states that "[w]hen any part of a writing or recorded statement is introduced by a party, . . . any party may introduce any other relevant parts."
>
> Appellant contends that prosecutorial misconduct deprived him of a fair trial. We conclude that the issue has not been preserved for appeal because appellant did not raise timely objections to the alleged incidents of misconduct. *See Parker v. State*, 109 Nev. 383, 391, 849 P.2d 1062, 1067 (1993). In any event, we are not convinced that the incidents cited by appellant constitute misconduct.

ECF No. 41-22 at 4, 6.

---

[1] Ground Five, Subpart A is discussed with Ground Eight.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must judge the remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 1.    Subpart B

Recktenwald argues that the State repeatedly misrepresented the law when it argued his guilt based upon his association with felons. ECF No. 98 at 21. The Respondents argue the State did nothing more than comment on the evidence. ECF No. 113 at 38.

During cross-examination, Recktenwald's trial counsel asked Gary Wiley, Recktenwald's roommate for nine months, if he had ever been convicted of a felony. ECF No. 79-1 at 145; ECF No. 79-2 at 11. Wiley answered in the affirmative and explained that he was convicted of battery to a police officer. ECF No. 79-2 at 11. Similarly, during cross-examination, Recktenwald's trial counsel asked Michael Scott Dunn, an occasional visitor at Recktenwald's house, if he had ever been convicted of a felony drug violation. *Id.* at 80, 84. Dunn answered in the affirmative. *Id.* at

84. Later, during its closing argument, the State commented, "[t]he defense asked Mike and Gary if they were convicted felons. And they are. Well, look who the defendant is hanging around and who would you expect him to be hanging around?" ECF No. 80 at 95.

Even if the State's comment that Recktenwald associated with felons can be classified as an inappropriate comment, this comment was based on facts that were presented at the trial. Indeed, Recktenwald's trial counsel was the one who established that Wiley and Dunn had been convicted of felonies. Because Wiley lived with Recktenwald and Dunn visited Recktenwald's house on an occasional basis, the comment that Recktenwald associated with felons is supported by the evidence and did not render Recktenwald's trial unfair. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that the State's improper closing argument did not infect the trial with unfairness because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence"). Moreover, the jury was instructed that "[s]tatements, arguments, and opinions of counsel are not evidence in the case," ECF No. 80-1 at 16, so it cannot be concluded that any misconduct amounted to a due process violation. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

### 2.      Subpart C

Recktenwald argues that the State improperly questioned M.H. about her prior consistent statements and then argued circuitously that M.H.'s recantation under oath at the second preliminary hearing was not true due to her prior consistent statements. ECF No. 98 at 21.

During the State's redirect examination of M.H. at trial, the State questioned M.H. about the
consistency of her testimony to her previous statements and preliminary testimony:

> Q.  . . . Isn't everything that you've said in this trial consistent with everything you have said in the past, except for the things you can't remember?
>
> A.  Yes.
>
> . . .
>
> Q.  . . . Can you explain to the Court how you got from California to Pahrump? Yes?
>
> A.  Yes.
>
> Q.  Isn't that exactly what you testified to here in Court?
>
> A.  Yes.
>
> . . .
>
> Q.  Didn't you tell the Court you were not free to leave his house?
>
> A.  Yes.
>
> Q.  Didn't you tell the Court that he pulled the phone out of the wall?
>
> A.  Yes.
>
> Q.  Didn't you tell the Court he stopped - - stopped you from leaving?
>
> A.  Yes.
>
> Q.  Didn't you tell the Court he had sex with you against your will?
>
> A.  Yes.
>
> Q.  Isn't that exactly what you testified to here?
>
> A.  Yes.
>
> Q.  Do you remember telling the Court before that he would give you drugs?
>
> A.  Yes.
>
> Q.  Isn't that what you testified to here?
>
> A.  Yes.
>
> Q.  Didn't you tell the Court before that he smoked it out of a light bulb?
>
> A.  Yes.
>
> Q.  Isn't that what you told the Court here?
>
> A.  Yes.
>
> . . .
>
> Q.  Okay. And the defense pointed out to you, uhhh, your trip from California to Pahrump and you testified that you stopped at your Aunt Stephanie's house?
>
> A.  Yes.
>
> Q.  And didn't you testify to that here as well?
>
> A.  Yes.
>
> Q.  And what little drug thing went on while you were at the - - Stephanie's house? Do you recall?
>
> A.  He was getting speed.
>
> Q.  And do you recall my asking you if he ever got violent with you to stop you from leaving?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| | Q. | And do you recall how you answered in Court here today? |
| 2 | A. | Yes. |
| | Q. | And what did you say? |
| 3 | A. | I said that he'd stand in front of the door and he pushed me away from the door. |
| 4 | Q. | Okay. . . . Isn't that what you testified to before? |
| | A. | Yes. |
| 5 | Q. | Now, you testified that he would tell you he loved you and he wanted to marry you and he wanted you to have his baby. You testified to that yesterday. Look at page thirty-two, lines three through eight. Isn't that what you testified to at the lower Court? |
| 6 | | |
| 7 | A. | Yes. |
| | | . . . |
| 8 | Q. | Now, you testified yesterday that the first time you ever took speed, tweak, methamphetamine, was with the defendant and it happened when you first lived with him. Do you remember saying that yesterday? |
| 9 | | |
| 10 | A. | Yes. |
| | Q. | Okay, look at page forty-six, lines sixteen through eighteen. Isn't that exactly how you testified previously? |
| 11 | | |
| | A. | Yes. Only I said that my sister was in the room. |
| 12 | | . . . |
| | Q. | Do you remember testifying that you did hit him to try to get him off you? |
| 13 | | |
| | A. | Yes. |
| 14 | Q. | Do you remember testifying to that previously? |
| | A. | Yes. |
| 15 | | . . . |
| | Q. | You recall the incidents with, uhhh - - with Mari when she ran to Shannon Cox's house, the Police Officer? |
| 16 | | |
| | A. | Yeah. |
| 17 | Q. | You do remember? |
| | A. | Yeah. |
| 18 | Q. | You remember testifying about that before previously? |
| | A. | Yeah. |
| 19 | | . . . |
| | Q. | Now you testified that in October when your mother took you over to his house there was a time when Paul touched you in front of her and you testified that she said words to the effect, "If you are going to do that, don't do it in front of me." |
| 20 | | |
| 21 | | |
| | A. | Yes. |
| 22 | Q. | Do you remember saying that at the preliminary hearing? |
| | A. | Yes. |
| 23 | Q. | So that was consistent? |
| | A. | Yes. |

. . .

Q.  Do you remember testifying that you let him do it but didn't want him to do it but you didn't fight because he was gonna do it anyway?

A.  Yes.

Q.  Isn't that what you testified to in Court here?

A.  Yes.

Q.  Do you remember telling Dawn Kelley he would beg you for sex?

A.  No.

Q.  And that's what you testified to at the preliminary hearing, isn't it? Didn't you testify that you didn't remember saying that?

A.  Yes.

ECF No. 79-1 at 65, 72-77, 80, 82-83, 85-87.

During closing argument, the State commented:

At one point the defense said to [M.H.], "Why don't you answer my questions the way you answer his?" Well, he asked them way different. He said, "Do you remember this? Do you remember this? Do you remember this? Do you remember this?" "I don't remember." That's not how I asked her the question. The question I said, "[M.H.], look at page twelve. Is that how you testified here today?" Answer: "Yes, yes." "[M.H.], look at page thirty-three. Look at that. Is that what you said up here?" Answer: "Yes." The State was merely demonstrating the consistency in her testimony.

ECF No. 40-7 at 96.

Although the state questioned M.H. about her preliminary hearing testimony and its consistency to her trial testimony at length, it cannot be concluded that such questioning was improper. Indeed, the State's questioning about M.H.'s prior consistent statements was in direct response to the defense asking M.H. about the inconsistencies between her preliminary hearing testimony and trial testimony. *See* ECF No. 79-1 at 121. Accordingly, assessing the State's questioning and corresponding closing argument "in the context in which they [were] made," *Boyde*, 494 U.S. at 385, it is clear that the State's actions did not "infect[ ] the trial with unfairness." *Darden*, 477 U.S. at 181; *see generally United States v. Collicott*, 92 F.3d 973, 979-80 (9th Cir. 1996) (recognizing that the Ninth "Circuit has historically allowed a party to

introduce prior statements because they were part of the same conversation or document from which impeaching inconsistent statements were drawn"); *United States v. Payne,* 944 F.2d 1458, 1471 (9th Cir. 1991) (allowing consistent statement from the same report from which the defendant drew the impeaching inconsistent statements because the consistent statements showed that the inconsistencies were minor); *United States v. Stuart,* 718 F.2d 931, 934 (9th Cir. 1983) (explaining that the defendant "opened the door" for prior consistent statements to be admitted by examining the agent about the declarant's prior inconsistent statements).

### 3.    Subpart D

Recktenwald argues that the State vouched for M.H.'s truthfulness by presenting the testimony of Dr. Elizabeth Richitt and by arguing that M.H. would not have gone through what she did in assisting in the prosecution of the case if the abuse never happened. ECF No. 98 at 21. The Respondents argue that the State merely bolstered M.H.'s credibility and did not personally vouch for her. ECF No. 113 at 41.[2]

During its opening argument, the State commented:

---

[2] Although not directly on point, it is worth noting that in Recktenwald's state direct appeal, the Nevada Supreme Court held:

> Appellant contends that the state's expert witness improperly commented on the veracity of the victim's testimony. We disagree. Appellant objected when the prosecutor asked the expert if the victim was making up her story and again when the prosecutor asked the expert if "adolescent behavior" influenced the victim's testimony. Because the expert did not answer either question, we conclude that appellant's contention lacks merit. Appellant contends that the "damage" was nevertheless done simply in the asking of the questions, although the expert never actually answered. Because appellant cites no authority in support of this contention, we decline to consider it. *See Pray v. State*, 114 Nev. 455, 959 P.2d 530 (1998); *Cunningham v. State*, 94 Nev. 128, 575 P.2d 936 (1978). Further, because appellant did not object to the intervening "adolescent bravado" testimony, he cannot on appeal assign error to that testimony. *See Phipps*, 11 Nev. at 1280, 903 P.2d at 823.

ECF No. 41-22 at 4.

You will hear from Doctor Richitt, Doctor Elizabeth Richitt, testify that in her opinion the victim, [M.H.], was sexually abused. She will also venture her opinion regarding why [M.H.] would say differing things, consensual, nonconsensual and she attributes that to something that she will refer to as adolescent bravado which is a way of saying that when a child lacks the necessary emotional, mental and physical tools, the product of a good upbringing in a nurturing home, when they lack the tools necessary to ward off unwanted advances, they will often say that this - - that the encounter is consensual in order to take back control of a situation they have no control over. By [M.H.] saying that one, some or all of these encounters were consensual, she was in fact saying, "You didn't rape me. I wanted it." When she says that, she is taking back some of the control in a situation she had no control over.

ECF No. 78-1 at 37. Dr. Richitt, a clinical psychologist, testified that she interviewed M.H., reviewed M.H.'s records, came to the conclusion that M.H. was sexually abused, and believed that M.H. exhibited signs of "adolescent bravado." ECF No. 79-1 at 123, 125, 129. Dr. Richitt explained that she:

saw . . . a child who [was] in a situation where she had no control of what was goin' on, . . . and she was trying to turn it around into a way that she did have control, . . . sometimes by saying that she loved this fellow or that she wanted to be with this fellow and that was her way of exerting some control in a situation and . . . being the one who is making the decisions rather than being the victim.

*Id.* at 129-30. Later, during its closing argument, the State commented:

It is inconceivable that [M.H.] would go through all of this, try to kill herself, cut her body, have defense attorneys rip at her and try to shred her to pieces if it never happened? She would not have gone to these lengths for someone who is a casual friend. You wouldn't go through what she's gone through for a lie. Use your common sense. We all know how special sex can be, especially in your tender years. [M.H.]'s lying? Why is she going to get beaten up by a defense attorney on the stand over and over again? Embarrassed? Ridiculed? Mom jumpin' down her throat?
. . .
The evidence shows that the discrepancies in her testimony do not necessarily mean that her testimony should be discredited but that misrecollection [sic] and mistake between witnesses are a common thing. Two different people may view things differently, and that's detailed for you in Instruction Number 9.

ECF No. 80 at 103-04, 110.

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Several factors are assessed in determining whether there was improper vouching:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Id.* at 1278.

Importantly, regarding Dr. Richitt's testimony, Recktenwald is not alleging improper vouching on the part of the State directly; rather, his contention concerns comments made by Dr. Richitt, a witness for the State. The Supreme Court has explained that one reason vouching is prohibited by the State is that a prosecutor's opinion "carr[ies] much weight." *Berger v. United States*, 295 U.S. 78, 89 (1935); *see also United States v. Young*, 470 U.S. 1, 18-19 (1985) ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."). Although Dr. Richitt was called as a witness by the State, her opinion that M.H. was sexually abused did not carry an "implication of official government support." *United States v. Weatherspoon*, 410 F.3d 1142, 1148 (9th Cir. 2005) ("[N]o *lawyer*, either public or private, should lay his or her own credibility on the line by expressing his or her own opinion about a witness' believability." (emphasis added)). Accordingly, it cannot be concluded that Dr. Richitt's testimony amounted to improper vouching on the part of the State. Further, to the extent that Recktenwald asserts that Dr. Richitt was presented by the State as a witness solely for her opinion regarding whether she

believed M.H. was sexually abused in order to bolster the State's case, a review of the record demonstrates that to be meritless. Rather, her testimony was used to explain why M.H. may have recanted her accusations. *See* ECF No. 78-1 at 37; ECF No. 79-1 at 129-30.

Turning to the State's closing argument that M.H. would not have put herself through the difficulties of testifying, the abuse of her body, or her suicide attempts if she was lying, it is necessary to assess the relevant *Necoechea* factors: the alleged vouching was a comment made during closing argument; the alleged vouching did not imply that the State had extra-record knowledge; there was no inference that M.H.'s veracity was being monitored; the degree of personal opinion was low, as the State did not explicitly state that it believed M.H. was telling the truth; M.H.'s credibility was attacked by Recktenwald; a jury instruction was given stating that "[s]tatements, arguments, and opinions of counsel are not evidence," ECF No. 80-1 at 16; and M.H.'s testimony was important to the case. Although this Court is acutely aware that M.H.'s testimony and credibility were crucial in this case, the remainder of the factors point to a finding that the comment did not amount to improper vouching. Indeed, it appears that the State was merely requesting the jury to assess the physical damage and discomfort that M.H. endured in order to determine whether she was credible or not. *See Necoechea* 986 F.2d at 1279 ("The prosecutor here argued that [the witness] told the truth because, if she were lying, she would have done a better job. This is simply an inference from evidence in the record. It is not . . . a reference to extra-record facts or a personal guarantee of [the witness]'s veracity. The prosecutor merely argued that [the witness] was telling the truth, an argument the prosecutor had to make in order to convict [the defendant]. These statements do not imply that the government is assuring [the witness]'s veracity, and do not reflect the prosecutor's personal beliefs.").

//

### 4.     Subpart E

Recktenwald argues that the State improperly belittled defense tactics. ECF No. 98 at 22. The Respondents contend that the State only commented on the defense's strategy and requested that the jury consider all the evidence. ECF No. 113 at 42.

During its closing argument, the State commented:

> A cloud of innocence that the Judge told you enveloped the defendant at the beginning of this trial is gone. It's all gone. Except for the wispy vapor trails that the defense is going to seek to get you to focus on, to look anywhere except the evidence that is staring you in the face.

ECF No. 80 at 93. And in response to Recktenwald's closing argument, the State commented:

> I want to talk to you about rabbit trails. We are about done here. Rabbit trails. A bear comes out of the forest and he kills your sheep and you go lookin' to get that bear and it's snowin', so you are following his tracks and you see all these rabbit trails. Before - - you start following the rabbit trails and pretty soon you forgot what you were doing and you forgot to be focused on what you were looking for, which was the bear. The defense has presented some rabbit trails to you. Don't look at [M.H.]. Look at the cops. They didn't do their job. They didn't do a rape kit. Focus on the cops. Running away. [M.H.] is always running away. Forget about her getting' raped. Remember her runnin' away. The defense said, again, it's another rabbit trail, just look at [M.H.]. She is the only witness that counts. Just look at [M.H.]. Why? It's obvious. He doesn't want you to look at Mike, who the defendant said he had - - he was having sex with her; Gary, the defendant - - who the defendant said he was - - said he was having sex with her; Angie who saw him having sex; Linda who got molested by him when she was eleven years old. He doesn't want you to go down those rabbit trails.

ECF No. 80 at 129, 132-33.

It appears that the first comment about the "wispy vapor trails" was merely a comment that the presumption of innocence that Recktenwald enjoyed at the beginning of the trial was mostly gone following the evidence presented at the trial. And it appears that the analogy reminding the listener to follow the bear tracks—the object of the search—over the rabbit tracks—a distraction—was used merely to emphasize that the jury should be focusing on M.H.'s

24

testimony and not the pieces of evidence highlighted by the defense. These comments were not belittling and were not improper. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."); *see also United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.").[3]

### 5.    Subpart F

Recktenwald argues that the State made improper victim-impact statements during its closing argument. ECF No. 98 at 22. Specifically, Recktenwald contends that the State argued that he caused M.H.'s suicidal and antisocial behavior and that M.H. never had a chance to be a little girl. *Id.* The Respondents argue that the State was merely commenting on the evidence. ECF No. 113 at 43.

During the second preliminary hearing held on December 6, 1996, M.H. testified that she tried to kill herself before Recktenwald abused her for the first time. ECF No. 75-25 at 135. M.H. explained that she had "been trying to kill [her]self since [she] was thirteen, before [she] even knew [Recktenwald] . . . so it's not because of [Recktenwald]." *Id.* Contrarily, at the trial, M.H. testified that she had tried to kill herself several times and that she "didn't try to kill [her]self until after [she] left [Recktenwald]s house" in September 1995. ECF No. 79 at 49-50, 69, 105.

---

[3] Recktenwald also appears to take issue with the following comment made during the State's closing argument: "That's what the drug abuse is showing. It was used to lure. He brought them in and said, 'Ain't it great?' And then it was being brought in to kill her, to destroy her soul. That's what is happening." ECF No. 80 at 108. Recktenwald's trial counsel objected, and the state district court "ask[ed] the jury to disregard" the comment. *Id.* at 108-09. Because it is presumed that a cautionary instruction is followed by the jury, *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000), and because this comment did not "'so infect[ ] the trial with unfairness,'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), any contention that this comment denied Recktenwald a fair trial lacks merit.

M.H. explained at the trial that her preliminary hearing statement that she had been trying to kill herself before she even met Recktenwald was a lie. ECF No. 79-1 at 6, 62-63. M.H. also testified at the trial that she used drugs for the first time when she lived with Recktenwald and that Recktenwald and her sister were the first people to supply her with drugs. ECF No. 79 at 49.

Christina Fregoso, M.H.'s caseworker, testified at the trial that M.H. was exhibiting suicidal tendencies, including cutting herself, in March 1996, after the string of abuses by Recktenwald that occurred in September 1995. ECF No. 80 at 6, 8. Recktenwald's trial counsel asked Fregoso if it would surprise her that M.H. "testified at [the] preliminary hearing indicating that . . . 'I have been trying to kill myself since I was thirteen, before I even knew Paul. Until this day I still do, so it's not because of Paul either." *Id.* at 10. Fregoso answered in the negative but then later indicated that M.H. had "no prior suicide attempts" before March 1996. *Id.* at 10, 12.

Recktenwald takes issue with two comments made by the State during its closing argument. First, the State commented that M.H.'s "[c]ase [w]orker also said she didn't begin to exhibit her suicidal, self-mutilating, drug-abusing behavior until after the first incident with the defendant." ECF No. 80 at 100. Because M.H.'s trial testimony reflected the fact that she did not attempt suicide until after the September 1995 events and did not use drugs until she was provided them by Recktenwald, ECF No. 79 at 49-50, 69, 105, and because Fregoso's testimony provided that M.H. first exhibited suicidal tendencies, including cutting herself, in March 1996, ECF No. 80 at 6, 8, this comment by the State was supported by the evidence. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that the State's improper closing argument did not infect the trial with unfairness because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence").

Second, the State commented that "[t]his victim has never had the chance to be a little girl and he stole it from her forever." ECF No. 80 at 102. This comment comes close to crossing the line of being improper due to its appeal to the jurors' emotions. *See Weatherspoon*, 410 F.3d at 1149 ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury"); *United States v. Nobari*, 574 F.3d 1065, 1077 (9th Cir. 2009). However, because Recktenwald sexually abused M.H. starting when she was fourteen years old, it can be concluded that the comment's basis was supported by the record. Further, the jury was instructed that "[s]tatements, arguments, and opinions of counsel are not evidence in the case," ECF No. 80-1 at 16, so it cannot be concluded that any misconduct amounted to a due process violation. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005).

In sum, because Recktenwald's assertions of prosecutorial misconduct are meritless, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Five.

## C.    Ground Seven

In Ground Seven, Recktenwald argues that his federal constitutional rights were violated due to the ineffectiveness of his trial counsel. ECF No. 98 at 24. Recktenwald alleges twelve instances of ineffective assistance of counsel. *See id.* at 24-39. In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *Id.* at 697.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[ *v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both

AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

In the August 22, 2017, order, this Court found portions of the subparts of Ground Seven to be unexhausted. ECF No. 111 at 11-13; *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991) ("[A] habeas petition who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). This Court noted that if Recktenwald returned to state district court to raise these unexhausted claims for the first time, the state district court would dismiss the petition because it would be successive and outside the one-year time limit to file a petition. ECF No. 111 at 15. As such, this Court found that the unexhausted portions of the subparts of Ground Seven to be technically exhausted and procedurally barred. *Id.*

Recktenwald argues that ineffective assistance of counsel in his state habeas action was cause for his procedural default of the unexhausted portions of Ground Seven. ECF No. 117 at 39. In *Martinez v. Ryan*, the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. 566 U.S. 1 (2012); *see generally Murray v. Carrier*, 477 U.S. 478, 488 (1986) (requiring a petitioner to "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule in order to demonstrate cause for a procedural default) To establish "cause" to overcome procedural default under *Martinez*, a petitioner must show: (1) the underlying ineffective assistance of counsel claim is "substantial"; (2) the petitioner was not represented or had ineffective post-conviction counsel; (3) the state post-conviction review proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral

proceeding. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013). This Court found that Recktenwald had

established the third and fourth requirements; however, because the determination of whether

Recktenwald satisfied the first and second requirements are intertwined with the merits, this

Court deferred ruling on the cause and prejudice issue until after the Respondents filed an answer

to the petition and Recktenwald a reply. ECF No. 111 at 15.

### 1. Subpart A

Recktenwald argues that his trial counsel was ineffective for failing to investigate and

present the exculpatory testimony of Angelique Marker, Jennifer Hoadley, and Terri Miller. ECF

No. 98 at 24. The Respondents argue that the timing of these witnesses' recantations casts doubt

on their veracity. ECF No. 113 at 52. This Court previously determined that the claims regarding

Miller were unexhausted. ECF No. 111 at 11.

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant contends that he has new evidence that he is actually innocent.
> Appellant asserts that, after trial, two witnesses recanted their testimony and
> accused the prosecution of forcing them to commit perjury. Even assuming a
> freestanding actual-innocence claim is cognizable in a post-conviction petition for
> a writ of habeas corpus, appellant's failure to provide the trial transcripts precludes
> our review of this claim, especially given that there were 20 other witnesses,
> including the victim, who testified against him at trial. *See generally Calderon v.
> Thompson*, 523 U.S. 538, 559 (1998) (explaining that, to demonstrate actual
> innocence, a petitioner must show that "it is more likely than not that no reasonable
> juror would have convicted him in light of . . . new evidence" (internal quotation
> marks omitted)). Thus, appellant fails to demonstrate that the district court erred in
> denying this claim.

ECF No. 46-15 at 8-9

On October 21, 1997, Angelique Marker testified at Recktenwald's trial that she saw

Recktenwald and M.H. having sex once and that she had a threesome with Recktenwald and

M.H. twice. ECF No. 40-3 at 37, 39, 55. Marker also heard Recktenwald tell M.H. that he loved

her. *Id.* at 40. Prior to this time, Marker had a sexual relationship with Recktenwald that started when she was fifteen years old. *Id.* at 39-41. Recktenwald gave Marker drugs on a regular basis while they were dating and engaged; their relationship ended when Recktenwald hit Marker. *Id.* at 40-42.

On November 3, 2000, Marker testified at a deposition that she did not meet Recktenwald or have sex with him until she was sixteen years old. ECF No. 44-17 at 34, 37-38. Marker explained that she only did drugs with Recktenwald once or twice, she did not see Recktenwald and M.H. having sex, Recktenwald never hit her, and she never had a threesome with Recktenwald and M.H. *Id.* at 39-41, 43-44. Marker explained that she lied at the trial "[b]ecause [she] was scared and everybody was telling [her] different stories and everything." *Id.* at 42. Marker felt threatened by M.H. because M.H. said "she was going to whoop [her] ass and everything else" if she did not lie. *Id.* Marker also felt compelled to lie because of her mom: "[e]ver since she met [Recktenwald], she's hated him, so she got into [Marker's] mind to try to put him away for life." *Id.* at 43. Finally, the prosecutor encouraged her to lie by "threaten[ing] to put [her] in jail." *Id.* at 44, 48-49, 53. Marker explained that she was changing her testimony and attending the deposition "because [Recktenwald] don't [sic] deserve to be in there, and [she] want[ed] to come out with the truth and help him." *Id.* at 55.

On October 21, 1997, Jennifer Hoadley testified at Recktenwald's trial that Recktenwald told her and her mom that he loved M.H. and had sex with M.H. ECF No. 78-2 at 157, 159. M.H. told Hoadley that she loved Recktenwald and that she was lying when she said that Recktenwald raped her. *Id.* at 162-63. M.H. told Hoadley that she lied because of M.H.'s mother, who wanted to go out with Recktenwald and threatened to send M.H. to "juvie" if she did not recant her accusations. ECF No. 79 at 2. On March 25, 2000, Hoadley signed an unsworn statement that

she lied at Recktenwald's trial, that Recktenwald did not tell her or her mother that he had sex with M.H., that M.H. told her that "they were making her do this to Paul," that her probation was discharged after she testified against Recktenwald, and that the prosecutor told her to say that Recktenwald had informed her that he had had sex with M.H. ECF No. 83-2 at 63-65.

Recktenwald contends that his trial counsel would have learned about Marker's and Hoadley's exculpatory testimony if he had conducted a reasonable investigation. ECF No. 98 at 26. While trial "counsel has a duty to make reasonable investigations," *Strickland*, 466 U.S. at 691, it is not reasonable that Recktenwald's trial counsel would have discovered at the time of the trial in 1997 that Marker and Hoadley were going to recant their testimonies on November 3, 2000, and March 25, 2000, respectively. To the extent that Recktenwald argues that his trial counsel would have been able to determine prior to the trial taking place that Marker and Hoadley were planning on lying at the trial had he conducted an adequate investigation, that argument is mere speculation. There is no evidence that Recktenwald's trial counsel would have been able to determine the falsity of their testimony through an investigation. If Marker and Hoadley were willing to go to such lengths as committing perjury because they felt threatened— as their recantations state—it seems unlikely that they would have simply admitted to Recktenwald's trial counsel that they were planning on lying if he had interviewed them prior to the trial. Accordingly, it cannot be determined that Recktenwald's trial counsel was deficient in his investigation of Marker and Hoadley. *Strickland*, 466 U.S. at 688.

Moreover, even if Recktenwald's trial counsel was deficient, Recktenwald cannot demonstrate prejudice because Marker's and Hoadley's testimonies were not especially significant. *Id.* at 694. Marker testified that she observed Recktenwald and M.H. having sexual intercourse on one occasion and had a threesome with Recktenwald and M.H. twice. ECF No.

40-3 at 37, 39, 55. And Hoadley testified that Recktenwald told her and her mom that he had sexual intercourse with M.H. ECF No. 78-2 at 157, 159. Even if Marker's and Hoadley's testimonies had not been presented, there would have still been testimony from Lieutenant Philips that Recktenwald admitted to having sexual intercourse with M.H. and testimony from M.H. that Recktenwald had nonconsensual intercourse with her many times. *See* ECF No. 78-1 at 52-53; ECF No. 79 at 60, 71-75. Accordingly, because the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence, *see* 28 U.S.C. § 2254(d), this Court denies Recktenwald habeas corpus relief with respect to the portion of Ground Seven, Subpart A dealing with the investigations of Marker and Hoadley.

Turning to Recktenwald's contention regarding Terri Miller, she signed an unsworn declaration on April 23, 1999, supporting Marker's 2000 deposition testimony, stating that "Angelique Marker told [her] she first had sex with Paul Recktenwald at Thanksgiving, 1995, after her sixteenth birthday." ECF No. 44-17 at 76. Miller explained that M.H. was also sixteen when she "began a consensual sexual relationship [with Recktenwald] in the fall of 1996." *Id.* M.H. "threatened to physically hurt Angelique if she didn't lie about Paul Recktenwald and make out a police report." *Id.* at 76-77. Further, "Angelique Marker told [Miller] that Nye County Deputy District Attorney Kirk Vitto talked to [Marker] in his office, and told [Marker] to lie about the sex, drugs, rape and kidnapping so he could put Paul Recktenwald in jail." *Id.* at 77.

Terri Miller is apparently Marker's friend. ECF No. 117. However, it is unclear whether Recktenwald's trial counsel even knew that Miller existed. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find mitigating evidence if,

after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence."). Recktenwald's trial counsel was not expected to have interviewed every person associated every witness in a search for mitigating evidence. *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990) (explaining that "trial counsel [is] not bound by an inflexible constitutional command to interview every possible witness"; rather, "counsel [is] simply required to exercise reasonable professional judgment in deciding" who to interview). Therefore, it cannot be concluded that Recktenwald's trial counsel was deficient in not finding Miller and interviewing her about her knowledge of the case. *Strickland*, 466 U.S. at 688. Because Recktenwald has not shown this claim of ineffective assistance of trial counsel regarding the investigation of Miller to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Thus, the portion of Ground Seven, Subpart A dealing with the investigation of Miller is denied as procedurally defaulted.

### 2. Subpart B

Recktenwald argues that his trial counsel was ineffective for numerous failures regarding M.H.'s testimony: Recktenwald's trial counsel failed to call his original counsel, who could have provided additional testimony regarding M.H.'s admission that she falsely testified at the preliminary hearing; failed to investigate and present evidence that Recktenwald had no power at his home in October 1996, which would have contradicted M.H.'s claim that she watched television at his home; and failed to move to exclude M.H.'s testimony entirely on the grounds that she had previously admitted that her accusations against Recktenwald were false. ECF No. 98 at 26-28. This Court previously determined that the first portion of this subpart regarding the

failure to call Recktenwald's original trial counsel as a witness was unexhausted and that the latter two portions of this subpart were exhausted. ECF No. 111 at 11-12.

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> First, appellant contends that counsel was ineffective for failing to impeach the victim with her admission that she lied under oath at the preliminary hearing and with evidence that would have contradicted her testimony that she watched television at appellant's house. We conclude that appellant has failed to demonstrate that the district court erred in denying this claim. The district court found that trial counsel did in fact cross-examine the witness about lying and making prior inconsistent statements and that the evidence presented by appellant did not establish that there was no electricity at his home when the victim was there. Appellant fails to address the district court's specific findings or present any argument on appeal demonstrating that the district court erred in denying this claim. Further, appellant fails to provide this court with an adequate appendix containing the complete trial transcripts and other pertinent parts of the record for this court's review on appeal. *See Thomas v. State*, 120 Nev. 37, 43 & n.4, 83 P.3d 818, 822 & n.4 (2004) (appellant is ultimately responsible for providing this court with portions of the record necessary to resolve his claims on appeal); *Greene v. State*, 96 Nev. 555, 558, 612 686, 688 (1980) ("The burden to make a proper appellate record rests on appellant."). Accordingly, appellant has failed to demonstrate that counsel was deficient or that there was a reasonable probability that, but for counsel's alleged errors, the outcome of the trial would have been different.
>
> Second, appellant argues that counsel was ineffective for failing to file a pretrial motion to exclude the victim's testimony at trial. Appellant has failed to demonstrate deficiency or prejudice, as he has not demonstrated that such a motion would have been successful. *See Donovan v. State*, 94 Nev. 671, 675, 584 P.2d 708, 711 (1978) (holding that counsel cannot be ineffective for failing to make futile motions).

ECF No. 46-15 at 3-4.

Recktenwald's original counsel, who represented Recktenwald during the two preliminary hearings, submitted an affidavit on December 30, 1996, explaining that M.H. told him during a break in the second preliminary hearing that "she had told [the State that she had lied under oath] and he advised her that the State had no intention of prosecuting her for her false testimony" and that the State "'made her'" testify. ECF No. 76-1 at 13. Although Recktenwald's

trial counsel could have called Recktenwald's original counsel as a witness at the trial to testify about this encounter, it would have been largely cumulative evidence. Indeed, M.H. testified at the trial that she gave a note, later identified at trial as "Exhibit Number J," to the Nye County District Attorney's Office during the second preliminary hearing. ECF No. 79-1 at 41-42. The note stated: "My family made me lie about Paul because they don't like him because of his charges in the past with another person and because of how old he is." ECF No. 85-8 at 2. It appears that Recktenwald's original counsel requested that M.H. sign and date the note so that it could be used as evidence later. *See* ECF No. 76-1 at 13. Accordingly, because Recktenwald's original counsel's testimony about what M.H. told him would have been cumulative to the note that M.H. signed at the same time, Recktenwald's suffered no prejudice from his trial counsel alleged deficient performance in not calling him as a witness. *Strickland*, 466 U.S. at 694; *see also Cunningham v. Wong*, 704 F.3d 1143 (9th Cir. 2013) (failing to call additional mitigating witnesses was not prejudicial since their testimony would have been cumulative of other testimony). Because Recktenwald has not shown this claim of ineffective assistance of trial counsel to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Therefore, this portion of Ground Seven, Subpart B is denied as procedurally defaulted.

During the trial, Recktenwald's trial counsel questioned M.H. about her preliminary hearing testimony. *See* ECF No. 79-1 at 55. One of M.H.'s answers during the preliminary hearing, which was repeated at the trial, was "I was laying on the couch watching TV." *Id.* Recktenwald attached a letter with three hand-written questions he posed to his electric company, Valley Electric Association, to his supplemental state habeas petition. *See* ECF No.

83-2 at 73. In response to Recktenwald's questions, an employee of Valley Electric Association apparently responded with three-handwritten answers. *Id.* The questions and responses demonstrate that "the power [was] shut off at the meter" on June 26, 1996; that "the power [was] shut off at the pole" on August 9, 1996; and that "the power [was] in fact still off at the pole and has . . . remained this way since the original time it was disconnected." *Id.* The letter is not dated or signed, and there is no service address referenced in the letter. *See id.* Recktenwald argues that this evidence "would have contradicted M.H.'s testimony." ECF No. 117 at 27. Assuming that this evidence is accurate, any impeachment value of this evidence is very low. Indeed, the only mention of M.H. watching television is testimony from M.H.'s second preliminary hearing, and M.H. admitted at trial that she was did not "remember nothing [sic] that [she] said or they asked [her] at the preliminary hearing" and that she was "high on speed at the [second] preliminary hearing." ECF No. 79 at 104-05. Accordingly, because M.H.'s preliminary hearing testimony was already suspect, it cannot be determined that Recktenwald was prejudiced by any potential deficiency regarding the failure to impeach that testimony. *Strickland*, 466 U.S. at 694.

Turning finally to Recktenwald's contention that his trial counsel should have moved to exclude M.H.'s testimony, Recktenwald's original counsel sought to have the matter "remanded to the Pahrump Justice Court to allow Judge Sullivan to consider [M.H.'s] perjured testimony in deciding whether or not [Recktenwald] should be bound over." *See* ECF No. 76-1 at 10. The state district court denied the motion. *See* ECF No. 76-5 at 9-10. If Recktenwald's original counsel had also moved for the exclusion of M.H.'s testimony, which is similar to contending that Recktenwald's case should be reevaluated by the justice court due to M.H.'s perjured testimony, it is likely that the state district court would have denied that request too.

Accordingly, Recktenwald cannot demonstrate that "the result of the proceeding would have been different" with the filing of the motion. *Strickland*, 466 U.S. at 694.

Therefore, the Nevada Supreme Court's ruling regarding the lack of ineffectiveness of Recktenwald's trial counsel concerning the electricity issue and moving to exclude M.H.'s testimony was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to the remainder of Ground Seven, Subpart B.

### 3.    Subpart C

Recktenwald argues that his trial counsel was ineffective for failing to effectively challenge Dr. Richitt's testimony at trial because he failed to elicit the fact that M.H.'s father was also a convicted child molester who could have caused her sexual abuse. ECF No. 98 at 28. Recktenwald also alleges that his trial counsel failed to uncover evidence that M.H. had previously accused a foster family member of sexually assaulting her, failed to obtain the records Dr. Richitt viewed, and failed to seek his medical records which demonstrated that he had difficulty having an erection around the time of the sexual assaults. *Id.* at 28-29. The Respondents argue that there was no evidence that M.H. was sexually abused by her father or that she previously accused a foster family member of sexual assault. ECF No. 113 at 63. The Respondents also assert that Recktenwald fails to demonstrate what records he did not have or how those records would have altered the outcome of the trial. *Id.*

This Court previously determined that Recktenwald's contention that his counsel failed to obtain medical records demonstrating that he had difficulty having an erection was unexhausted.

ECF No. 111 at 12. However, this Court determined that his contention that his counsel failed to investigate and effectively challenge the testimony of Dr. Richitt was exhausted. *Id.*

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to obtain records used by the State's expert witness Dr. Richett and for failing to question her about the victim's prior allegations of sexual assault and the victim's father who was a convicted child molester. Appellant fails to demonstrate deficiency or prejudice. The record shows that counsel elicited from the expert that she knew about the victim's father and that this knowledge did not change her opinion that the victim had been sexually abused. Appellant does not explain which records counsel should have obtained or how counsel's failure to do so affected the outcome of the trial. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this Court."). Furthermore, in light of appellant's failure to provide this court with trial transcripts, appellant cannot demonstrate a reasonable probability that, but for counsel's alleged errors, the outcome of the trial would have been different. *See Thomas*, 120 Nev. at 43 & n.4, 83 P.3d at 822 & n.4; *Greene*, 96 Nev. at 558, 612 P.2d at 688. Thus, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 273 at 4-5.

With regard to Recktenwald's contention about his medical records, Richard Walter Kudrewicz, M.D. performed a disability evaluation on Recktenwald prior to the trial on March 14, 1996. ECF No. 85-10. Although the entirety of the report was not provided, it does appear that Dr. Kudrewicz reported that Recktenwald "is able to achieve an erection with some difficulty." *Id.* at 3. It is unclear from the record whether Recktenwald told his trial counsel about this medical record's existence or whether Recktenwald's trial counsel had any basis to know about Recktenwald's medical condition, so it is difficult to assess whether Recktenwald's trial counsel was deficient. However, even if he was deficient, Recktenwald fails to demonstrate that he was prejudiced. *Strickland*, 466 U.S. at 694. A single sentence in a medical report that Recktenwald had "some difficult" having an erection can only be said to "have had an isolated,

trivial effect" on the evidence as a whole. *Id.* at 696. Indeed, there was substantial evidence of Recktenwald's guilt. *See* Ground Four *supra*. Because Recktenwald has not shown this claim of ineffective assistance of trial counsel regarding this medical record to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Therefore, this portion of Ground Seven, Subpart C is denied as procedurally defaulted.

Turning to the remainder of Recktenwald's contentions concerning Dr. Richitt, as a reminder, Elizabeth Richitt, a clinical psychologist, testified on direct examination that she interviewed M.H., reviewed M.H.'s records, and believed that M.H. was sexually abused. ECF No. 79-1 at 123, 125, 129. On cross-examination, Recktenwald's trial counsel asked Dr. Richitt if it "[w]ould . . . be helpful to find out [M.H.'s] father had been sexually molested." *Id.* at 136. Dr. Richitt responded "I had that." *Id.* Although Recktenwald's trial counsel's question about M.H.'s father was phrased incorrectly—whether she knew that M.H.'s father had been sexually molested versus whether she knew that M.H.'s father had committed sexual molestation—it appears that that Dr. Richitt understood what Recktenwald's trial counsel meant by his question. *See* ECF No. 83-2 at 79 (documentation appearing to state that M.H.'s father, David Holmes, was convicted of child molestation). However, Recktenwald's trial counsel failed to ask the appropriate follow-up question regarding whether it was possible that M.H.'s signs of sexual abuse could have come from her father and not Recktenwald. This may amount to deficient performance. However, Recktenwald fails to demonstrate that he was prejudiced by this potential deficiency. *Strickland*, 466 U.S. at 694. It is mere speculation that Dr. Richitt would have testified that M.H.'s father's conviction could have been the source of M.H.'s signs of sexual

abuse. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."). Indeed, after answering that she had information showing that M.H.'s "father had been sexually molested," Dr. Richitt testified that that information did not "assist[ her] in making some determination that [M.H.] may have been sexually molested." ECF No. 79-1 at 136. Therefore, it appears that Dr. Richitt came to her conclusion that M.H. was sexually abused by Recktenwald independent of any allegation that M.H. was potentially abused by another person.

Turning finally to Recktenwald's final two contentions—that his trial counsel failed to uncover evidence that M.H. had previously accused a foster family member of sexually assaulting her and failed to obtain the records Dr. Richitt reviewed—Recktenwald fails to provide citations demonstrating that either of these allegations are true. Recktenwald only cites to his supplemental state habeas corpus petition. *See* ECF No. 98 at 28 (citing ECF No. 44-17). Moreover, Dr. Richitt testified that she reviewed M.H.'s custody records from California, M.H.'s testimony from the preliminary hearings, and the police reports. ECF No. 79-1 at 125-26. It is unclear which of these reports Recktenwald's trial counsel is assumed not to have obtained. In fact, the state district court granted Recktenwald's trial counsel's application for the release of M.H.'s juvenile records. ECF No. 38-2 at 5. Accordingly, it cannot be determined that Recktenwald's trial counsel was deficient. *Strickland*, 466 U.S. at 688. Therefore, because the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence, *see* 28 U.S.C. § 2254(d), this Court denies Recktenwald habeas corpus relief with respect to the remainder of Ground Seven, Subpart C.

### 4.    Subpart D

Recktenwald argues that his trial counsel was ineffective for failing to impeach Charles Moore. ECF No. 98 at 29. Recktenwald explains that Moore received a beneficial plea agreement, and his trial counsel failed to investigate to determine whether that deal was done in exchange for Moore's testimony. *Id.* The Respondents argue that Recktenwald provides no support for his allegation that the plea was in exchange for Moore's testimony and that Moore had not yet been sentenced so his plea deal was inadmissible under Nev. Rev. Stat. § 50.095(1). ECF No. 113 at 67.

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to question C. Moore about his status as a jailhouse informant for the State and the beneficial plea and sentence that he received in exchange for his testimony. Appellant fails to demonstrate deficiency or prejudice. This claim is belied by the record, as counsel elicited from Moore that he had written a letter to the district attorney offering to provide information on various individuals, including appellant, in exchange for a plea agreement. As Moore had not yet been sentenced at the time of his testimony, counsel could not have questioned him about the terms of the sentence. Thus, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 4.

Charles Moore, Recktenwald's neighbor, testified that Recktenwald asked him if he wanted to get drunk and do drugs and explained that "he had a couple young girls over [at his house] that were high, too, and want to know if [Moore] really wanted to have sex with them." ECF No. 79 at 12-14. On cross-examination, Recktenwald's trial counsel asked Moore if he had ever been convicted of a felony. *Id.* at 16. Moore responded, "[n]o, sir. Not until now anyway."

*Id.* The state district court then explained that Moore had not yet been sentenced, so "he's not a felon."[4] *Id.*

Recktenwald's trial counsel asked Moore if he "notif[ied] the District Attorney and t[old] him that [he] wanted to testify concerning a bunch of the inmates." *Id.* at 17. Moore answered in the affirmative. *Id.* Recktenwald's trial counsel then attempted to admit "Defendant's Exhibit Number E," which was a letter Moore had written to the State.[5] *Id.* Recktenwald's trial counsel argued why the letter should be admitted: "the relevance is that he may be fabricating what he's saying because he's gonna get a deal because he called the DA's office or wrote them and said - - said, 'I can turn all these guys in jail.'" *Id.* at 17-18. Recktenwald's trial counsel also explained that he believed the letter was "valid evidence that should be admitted for impeachment purposes." *Id.* at 18. After the letter was disallowed by the state district court, Recktenwald's trial counsel questioned Moore about the letter:

> Q.    Did or did you not write a letter to the District Attorney's Office indicating that in order to keep from going to trial on March 17th, you were willing to plead to certain charges?
> A.    Yes.
> Q.    Did you say that? And you also gave them information about ten names of those who were in jail, didn't you?
> A.    Some of them were in jail, some were not in jail.
> Q.    What was the purpose of your giving all these names of all these people to the District Attorney's Office?
> A.    Because most of them were drug users and I don't like drugs.

_____

[4] According to his guilty plea agreement, Moore agreed to plead guilty to lewdness with a child under 14 years of age. ECF No. 95-1 at 2.

[5] The letter that Moore wrote to the State stated: "To keep from going to trial on March 17, 1997, I am willing to plea to a misdemeanor (slapping my wife) time served, will not phone, write or try to see my soon to be x-wife, my stepdaughter, and daughter ever and will move to Louisiana." ECF 95-2. The letter also stated: "I will give you these 10 names of those who need to be in jail for a while and 2 of which need to be in prison for a while." *Id.* Moore included Paul Recktenwald in the list and wrote "drugs and sex with minors" next to his name. *Id.* Moore's letter also indicated that Recktenwald told him "in March of April of 1996 he was doing it with two girls." *Id.*

| | | |
|---|---|---|
| 1 | Q. | And did you base some of this information on what somebody else told you? |
| | A. | No, sir. What I'd eyewitnessed [sic] and seen [sic] myself happen. |
| 2 | Q. | So all these people on here that say, big time drug sale, drug use and sale, |
| | | drugs, drug use, sale and hot checks, drug use, drug sales, all these you |
| 3 | | observed and you participated in or how did you know about all this? |
| | A. | I seen [sic] it happen, sir. |
| 4 | Q. | You seen [sic] each one of these people use drugs or sell drugs? |
| | A. | Yes, sir. |
| 5 | Q. | And then under Mr. Recktenwald you have drugs and sex with minors. You |
| | | saw him have drugs and sex with minors? |
| 6 | A. | I seen him have the drug, be on drugs but I didn't see him have the sex with |
| | | the minors. |
| 7 | Q. | You put it on here saying that to the DA. Anything else on here not true? |
| | A. | No, sir. |
| 8 | Q. | Oh, that one just happened to punch out as being not true? |
| | A. | No, sir, it's not that. I don't believe it's not true. It's just that Paul had told |
| 9 | | me about having sex with young girls, so I figured that is what it was. |
| | Q. | Oh, now the story's changed. On your initial - - on direct examination, it |
| 10 | | was that you had this one time passing and he said, "Come, let's get high |
| | | and we can have some fun with the girls." Isn't that what you said initially? |
| 11 | A. | Yes, sir. |
| | Q. | How, we have moved to that? |
| 12 | A. | To I assume - - |
| | Q. | You assume? |
| 13 | A. | (continuing) - - that he was having sex. |
| | Q. | Oh, there you go. Did you assume all the rest of these people were taking |
| 14 | | drugs and selling drugs? |
| | A. | No, sir. |
| 15 | | |

*Id.* at 19-21. Later, on redirect examination, Moore answered in the negative when asked by the
State if he was promised anything from the State or if he was given anything from the State for
his testimony. ECF No. 79 at 23.

Beyond inquiring about a possible deal with the State for his testimony, which the State
questioned Moore about, it is unclear what further questions Recktenwald expected his trial
counsel to ask Moore in order to impeach him. Indeed, Recktenwald's trial counsel questioned
Moore about being convicted of a felony, attempted to admit a letter Moore had written
implicating other individuals for his own gain, argued vehemently for the admission of the letter,

and then questioned Moore extensively about the letter. ECF No. 79 at 16-21. Recktenwald's

trial counsel even got Moore to concede that he only "assumed" Recktenwald was having sex

with minor children. *Id.* at 20. Accordingly, it cannot be concluded that Recktenwald's trial

counsel's performance in impeaching Moore was deficient. *Strickland*, 466 U.S. at 688.

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable

application of, clearly established federal law, as determined by the Supreme Court, and was not

based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. §

2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Seven,

Subpart D.

### 5.    Subpart E

Recktenwald argues that his trial counsel was ineffective for failing to impeach Michael

Dunn. ECF No. 98 at 30. Recktenwald explains that Dunn was charged with unlawful possession

of a controlled substance and received a generous deal; however, Recktenwald's trial counsel

failed to conduct discovery and impeach Dunn with the possibility that the generous terms of the

plea deal caused Dunn to testify in line with the State against Recktenwald. *Id.* This Court

previously determined that this subpart was entirely unexhausted. ECF No. 111 at 12.

Prior to Recktenwald's trial, Michael Dunn was convicted of unlawful possession of a

controlled substance, a category E felony. ECF No. 95-9 at 2. At Recktenwald's trial, Dunn

testified that he occasionally visited Recktenwald's house, that he saw Recktenwald and M.H.

sleeping in the same bed, that he saw Recktenwald give M.H. drugs, and that he warned

Recktenwald about having sex with M.H. ECF No. 79-2 at 80-82. On cross-examination,

Recktenwald's trial counsel questioned Dunn about his drug conviction:

> Q.     You have been convicted of a drug violation, haven't you? A
> felony?

| | A. | Yes, I have. |
| | Q. | And you got a deferred program, didn't you? |
| | A. | Yes. |
| | Q. | Where, if you complete your probation, you will be able to get everything wiped out of your record? |
| | A. | Correct. |
| | Q. | Was that part of your reason for coming in to testify today, your diversion? |
| | A. | No, sir, has nothing to do with it. |
| | Q. | Okay. Good. |

*Id.* at 84.

Although Recktenwald's trial counsel questioned Dunn about whether his diversion sentence for a drug conviction was "part of [his] reason for coming in to testify" against Recktenwald, *see id.*, it appears that Recktenwald wanted his trial counsel to go one step further and ask Dunn whether he felt compelled—regardless of the lack of a requirement—to testify against Recktenwald due to his generous plea deal. ECF No. 98 at 30. While the "failure to cross-examine [a] witness about their motivation for testifying as they did . . . [is] unreasonable and [not] considered 'sound trial strategy,'" *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689), Recktenwald's trial counsel did properly question Dunn about his possible motivation for testifying. Therefore, Recktenwald's trial counsel's performance was not deficient. *Strickland*, 466 U.S. at 688. Because Recktenwald has not shown this claim of ineffective assistance of trial counsel regarding a failure to adequately impeach Dunn to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Accordingly, Ground Seven, Subpart E is denied as procedurally defaulted.

//

### 6.     Subpart F

Recktenwald argues that his trial counsel was ineffective for failing to impeach Coleman by inquiring about the benefit she received from the plea agreement she entered for her charges of statutory sexual seduction. ECF No. 98 at 31. The Respondents argue that Recktenwald fails to demonstrate that Coleman's plea was dependent on her testimony against Recktenwald because she was sentenced prior to his trial. ECF No. 113 at 72.

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to cross-examine D. Coleman about the nature of her plea bargain and whether she was being allowed to testify truthfully. Appellant fails to demonstrate deficiency or prejudice. Coleman testified under oath that she had entered an *Alford* plea to sexual seduction and that she had received a very good deal by pleading guilty because she was initially charged with multiple counts with potential sentences of life in prison. Appellant fails to demonstrate that any further questioning by counsel about the nature or terms of her plea had a reasonable probability of changing the outcome of the trial. The, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 5-6.

Coleman, who was known by the surname Valentine prior to Recktenwald's trial, was originally charged with eight counts of sexual assault, seven counts of statutory sexual seduction, and one count of kidnapping, which stemmed from aiding and abetting Recktenwald in the abuse of M.H., her daughter. ECF No. 95-3 at 2; ECF No. 95-5 at 6-7; ECF No. 95-4. Coleman was sentenced on October 14, 1997, for one count of statutory sexual seduction. ECF No. 95-7 at 2; ECF No. 95-6 at 2.

Coleman testified at Recktenwald's trial about the charges against her. ECF No. 80 at 17, 20. On direct examination, Coleman explained that she was in jail currently for sexual seduction "[b]ecause they said [she] took [her] daughter to - - [M.H.] to [Recktenwald]'s house and

dropped her off." *Id.* at 20. Recktenwald's trial counsel then asked some follow-up questions during cross-examination:

> Q.    Miss Valentine, your plea to the charges that you are now facing prison for, the felony, that was what they call an Alford plea, wasn't it?
> A.    Yes.
> Q.    What does that mean to you?
> A.    I'm not sure what it meant.
> Q.    If I were to tell you the Alford plea means you are pleaing [sic] guilty to something because you are getting benefits, not because you did anything, is that what your attorney told you?
> A.    Basically, yes.
> Q.    So you haven't admitted to doing anything, is that true?
> A.    Right.

*Id.* at 22-23. Then on re-direct examination, Coleman explained that she was "originally charged with multiple Counts [sic] of life sentences," but that she got a "tremendous benefit by the plea [she] entered." *Id.* at 40.

Although Recktenwald's trial counsel and the State both elicited testimony that Coleman received a benefit from the plea deal she entered with the State, there was no questioning about whether that benefit was received in return for her testimony against Recktenwald. However, because Coleman's testimony at trial was insignificant in terms of establishing Recktenwald's guilt, there is no prejudice stemming from Recktenwald's trial counsel's possible deficient performance in not adequately impeaching her. *Strickland*, 466 U.S. at 688; *see also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence"). Indeed, Coleman testified that she was unaware that Recktenwald was having sex with M.H., and she only became aware after Recktenwald was arrested in October 1996. ECF No. 80 at 20, 25, 29-30. Further, Coleman testified that when M.H. finally disclosed to her that she had sexual intercourse with

48

Recktenwald, M.H. told Coleman that she "was in love with him" and "never said anything about him keeping her against her will" or "[f]orcibly raping her." *Id.* at 36-37. Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Seven, Subpart F.

### 7.    Subpart G

Recktenwald argues that his trial counsel was ineffective for failing to move to exclude the testimony of Linda and Mary Baumgartner. ECF No. 98 at 33. Recktenwald explains that Linda Baumgartner's testimony concerned a 17-year old incident that was improperly admitted against Recktenwald because the incident was not proven by clear and convincing evidence, was unduly prejudicial, and was not sufficiently similar. *Id.*; ECF No. 117 at 32.

In Recktenwald's state direct appeal, the Nevada Supreme Court held:

> Appellant first contends that the district court erred in admitting evidence of appellant's prior bad acts. We conclude that the district court erred in admitting Linda Baumgartner's testimony under *Meek v. State*, 112 Nev. 1288, 1294, 930 P.2d 1104, 1108 (1996), because the incident with Baumgartner was dissimilar to the alleged conduct for which appellant was on trial and occurred seventeen years earlier. Nevertheless, given the overwhelming evidence against appellant, we conclude that admission of Baumgartner's testimony was harmless error because "had the district court not admitted the evidence, the results would have been the same." *Chappell v. State*, 114 Nev. 1403, 1407, 972 P.2d 838, 840 (1998) (citing *Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985)).

ECF No. 41-22 at 3. In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to file a motion a preclude "improper bad act evidence." Appellant fails to demonstrate prejudice. This court concluded on direct appeal that an incident testified to by L. Baumgartner should not have been admitted at trial but that the admission was harmless error in light of the overwhelming evidence by appellant. *See Recktenwald, Jr. v. State*, Docket No. 32103 (Order Dismissing Appeal, January

25, 2000). Accordingly, appellant does not demonstrate that, had counsel filed such a motion, there was a reasonable probability of a different outcome at trial. Thus, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 6.

Prior to trial, the State moved for the admission of the "bad act testimony" of Linda Baumgartner. ECF No. 77-35. The state district court held a *Petrocelli* hearing during the trial outside the presence of the jury. ECF 80 at 43. Baumgartner testified that she was molested when she was eleven years old. *Id.* at 50-51. Baumgartner explained that she was in a park when a strange man approached her and walked into the woods with her. *Id.* at 52-53. That man kissed her and then: "pull[ed] down [her] pants and . . . pulled down his pants. He touched [her]. He felt [her] chest, he felt [her] down there, he put his . . . private area on [hers]." *Id.* at 53. Baumgartner testified that Recktenwald was the man who molested her. *Id.* at 56. Mary Baumgartner, Linda's mother, testified that Linda told her what happened in the woods with Recktenwald. *Id.* at 59-62. Recktenwald's trial counsel argued that Linda and Mary Baumgartner's testimonies should not be allowed, explaining that "we are talking about matters that aren't related to incidents or occurrences involving the charges here." *Id.* at 64-67. Recktenwald's trial counsel also asserted:

> The difficulty I have with [Linda and Mary Baumgartner] is we are talking about some act or offense that occurred over seventeen years also. It is not similar whatsoever to the acts or conduct alleged here. What's alleged here is not somebody molesting an eleven year old daughter or an eleven year old child. What's alleged here is substantially different. What's alleged here is consensual sex or sex under circumstances where the person was deprived of their ability to consent. Uhh, so the first thing I'm arguing with regard to these last two witnesses is the remoteness in time.

*Id.* at 66. The state district court allowed the evidence. *Id.* at 70. However, the State only called Linda Baumgartner to testify at the trial; Mary Baumgartner was never called. *See* ECF No. 80 at 4 (showing that only Linda Baumgartner was recalled to testify after the *Petrocelli* hearing).

Recktenwald argues that his trial counsel was deficient because he should have filed a

written motion to preclude Baumgartner's testimony rather than merely opposing the State's

motion for the admission of the evidence at the *Petrocelli* hearing. ECF No. 98 at 33. However,

Recktenwald provides no support for this contention that an objection or opposition to evidence

must be made in a specific way. Indeed, "[r]are are the situations in which the wide latitude

counsel must have in making tactical decisions will be limited to any one technique or

approach." *Harrington*, 562 U.S. at 106; *see also Strickland*, 466 U.S. at 688-89 ("No particular

set of detailed rules for counsel's conduct can satisfactorily take account of the variety of

circumstances faced by defense counsel or the range of legitimate decisions regarding how best

to represent a criminal defendant."). Because Recktenwald's trial counsel opposed the admission

of Baumgartner's testimony and made various arguments explaining why the testimony should

not be allowed, it cannot be concluded that Recktenwald's trial counsel's "representation fell

below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Therefore, the

Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly

established federal law, as determined by the Supreme Court, and was not based on an

unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This

Court denies Recktenwald habeas corpus relief with respect to Ground Seven, Subpart G.[6]

---

[6] In his reply brief, Recktenwald also appears to argue that his trial counsel was
ineffective for failing to move to exclude the testimony of Leslie Holmes because her allegations
of a sexual encounter with Recktenwald were unsupported by any physical evidence and were
disputed. ECF No. 117 at 32. Holmes testified at the *Petrocelli* hearing that she unwillingly had
sex with Recktenwald when she was fifteen years old because "Recktenwald told [her mother] he
was going to kick [her] brothers and sisters out on the street" if she did not have sex with him.
ECF 80 at 44-46. Recktenwald's trial counsel argued that Holmes should not be allowed to
testify because "there is ample evidence of the issues that are being addressed by this witness
without using prior bad acts" and the testimony of Holmes did not "prove scheme, plan, motive,
intent, design . . . by the bad conduct." *Id.* at 49. Because Recktenwald's trial counsel opposed

### 8.     Subpart H

Recktenwald argues that his trial counsel erred when he elicited evidence of his prior convictions and then failed to strike the answer and seek a mistrial. ECF No. 98 at 33-34. The Respondents argue that Recktenwald's trial counsel raised the issue in order to attack the witness's credibility. ECF No. 113 at 77. This Court previously determined that his subpart was exhausted. ECF No. 111 at 13. The Nevada Supreme Court "decline[d] to consider this issue" in Recktenwald's state direct appeal because Recktenwald "did not object to that evidence." ECF No. 41-22 at 3. In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for eliciting testimony from a State witness that appellant had convictions for rape and murder. Appellant fails to demonstrate prejudice. In light of appellant's failure to provide this court with trial transcripts, he cannot demonstrate a reasonable probability that, but for counsel's alleged errors, the outcome of the trial would have been different. *See Thomas*, 120 Nev. at 43 & n.4, 83 P.3d at 822 & n.4; *Greene*, 96 Nev. at 558, 612 P.2d at 688. Thus, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 6.

During cross-examination, Recktenwald's trial counsel questioned Coleman about living with Recktenwald:

> Q.     How did Paul treat them?
> A.     All right. When I first moved in there, everything was fine. Paul was a really nice person. He told me I could come there because I needed a place to stay. Everything was going really good, we really got along. Paul was treating everybody all right.
> Q.     And what happened to the circumstances? Why did you move out then?
> A.     Why did I move out?
> Q.     Uh-huh.
> A.     Because they took my kids.
> Q.     Why?

---

the admission of Holmes' testimony, it cannot be concluded that Recktenwald's trial counsel's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

| | |
|---|---|
| A. | Because they said I was living with a convicted murderer.[7] |
| Q. | So they hadn't done a home evaluation of the home that you were living at, is that it? |
| A. | Yes. They had a Social Worker come out, okay, and she sat and talked to Paul. She talked to me, she checked the house out. That was probably six months before they ever came out and took my kids. The day before they took my kids, they sent an Officer out. She came, she checked the house out, she checked the kids out and she said she couldn't find anything wrong. She said they were there because they had calls about child abuse. She checked everything out, she said she couldn't find anything wrong, she left. The next day she came back with a Social Worker and she took my kids, and the reason they gave me was, was I was living with a convicted murderer. |
| Q. | There was no other reason for that? |
| A. | No. |
| Q. | Was there any verification or anything like that? |
| A. | No. |

ECF No. 80 at 17-18, 22, 38-39. This testimony took place on October 23 or 24, 1997. *Id.* at 2.

Previously, on October 21, 1997, M.H. testified that the State of California had custody of her

and her siblings because of her "mom's drinking" and because M.H.'s mother "wouldn't take

care of her kinds and [M.H.] was always having to take care of [her] sisters and brothers." ECF

No. 78-2 at 3; ECF No. 79 at 48.

Because M.H. testified a few days earlier that she was removed from Coleman's care due

to Coleman's alcoholism and neglect, it appears that Recktenwald's trial counsel did not expect

Coleman to suggest that Recktenwald was a convicted murder when responding to his question

about why her children were removed. This conclusion is supported by Recktenwald's trial

counsel's follow-up question inquiring if there was any other reason for the removal of her

---

[7] It is noted that Recktenwald was not previously convicted of murder; rather, he was previously convicted of burglary, grand theft, indecent exposure, indecent assault, corruption of minors, involuntary manslaughter, robbery, criminal conspiracy, criminal conspiracy to commit theft, and possession and forgery of endorsements upon stolen U.S. Treasury checks. ECF No. 76-31 at 2.

children. Accordingly, because the comment appears to have been wholly unexpected, it is difficult to conclude that Recktenwald's trial counsel's performance was deficient. *Strickland*, 466 U.S. at 688. However, even if Recktenwald's trial counsel's performance was deficient, Recktenwald cannot show prejudice. *Id.* at 694; *see generally Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir. 1984) (concluding that "[a]though [the defendant]'s contention [that his trial counsel elicited damaging testimony from a prosecution witness] has some merit, the snippet of testimony was not sufficiently damaging . . . to shake our confidence in the reliability of the jury's verdict"); *United States v. Gooch*, 842 F.3d 1274, 1279 (D.C. Cir. 2016) (concluding that no prejudice resulted from the defendant's trial counsel's open-ended question when cross-examining a police detective about why the defendant had ceased going to a particular area, which led the detective to respond "[b]ecause he shot the people" because this was a "fleeting remark" made during a month-long trial and the evidence of guilt was substantial). Recktenwald's trial counsel mitigated the damaging testimony by getting Coleman to admit that there was no verification done proving that Recktenwald was a convicted murderer. Further, there was substantial evidence of Recktenwald's guilt, *see* Ground Four *supra*.

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Seven, Subpart H.

### 9.     Subpart I

Recktenwald argues that his trial counsel failed to request a transition jury instruction or at least failed to request a transition instruction that the jury was able to understand and that

intelligibly conveyed the standard. ECF No. 98 at 34-35. Recktenwald also argues that his trial counsel was ineffective for not objecting and seeking a mistrial based on the jury's improper verdict. *Id.* at 36. Finally, Recktenwald argues that his trial counsel failed to request an instruction cautioning the jury about weighing the testimony of a former addict—pointing to the testimony of M.H., Marker, Coleman, Wiley, Dunn, and Moore. *Id.* The Respondents argue that the jury finding Recktenwald guilty of all counts of sexual assault and statutory sexual seduction does not demonstrate that his trial counsel was ineffective or that the instruction was incorrect. ECF No. 113 at 80.

This Court previously determined that only the claim regarding the transition jury instruction was exhausted; the remainder of this subpart is unexhausted. ECF No. 111 at 13.

In Recktenwald's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to provide the jury with a transition instruction, which resulted in the jury finding him guilty of both sexual assault and the lesser-related offense of statutory sexual seduction. This claim appears to be belied by excepts of the trial transcripts and by appellant's own allegations, which indicate that the jurors were instructed that they could consider whether appellant was guilty of statutory sexual seduction if they had a reasonable doubt that he was guilty of sexual assault, but that they could not find him guilty of both. Furthermore, appellant fails to demonstrate prejudice, as the district court dismissed the sexual seduction counts after the jury found him guilty of sexual assault. Therefore, appellant fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 6-7.

The Second Amended Information alleged that Recktenwald committed seven counts of sexual assault, six counts of statutory sexual seduction, two counts of possession of a controlled substance, and one count of kidnapping. ECF No. 77-34 at 2-7. The jury found Recktenwald guilty of all counts. ECF No. 80-2. At sentencing, the state district court set aside the statutory

sexual seduction counts as lesser-included offenses of the sexual assault counts. ECF No. 80-11 at 4.

Jury Instruction No. 23A instructed the jury as follows:

Statutory sexual seduction is a lesser related crime of sexual assault. If you have a reasonable doubt as to whether the defendant is guilty of sexual assault but you find beyond a reasonable doubt the defendant is guilty of statutory sexual seduction, you should only find the defendant guilty of the lesser related offense of statutory sexual seduction.

You should not find the defendant guilty of both of the above crimes on any specific date or specific incident. Each pair of counts and your determination of guilt or innocence must be based on the facts admitted into evidence concerning that incident.

ECF No. 80-1 at 32.

Following Recktenwald's trial, the Nevada Supreme Court held that "when a transition instruction is warranted," meaning that the jurors need guidance in their "consideration of a primary charged offense [and] the[ir] consideration of a lesser-included offense," the state district court is required to "instruct the jury that it may consider a lesser-included offense if, after first fully and carefully considering the primary or charged offense, it either (1) finds the defendant not guilty, or (2) is unable to agree whether to acquit or convict on that charge." *Green v. State*, 119 Nev. 542, 545, 548, 80 P.3d 93, 95, 97 (2003). Because *Green* was decided six years after Recktenwald's trial, it cannot be concluded that Recktenwald's trial counsel was deficient for not requesting an instruction in accordance with *Green*. *Strickland*, 466 U.S. at 688. Moreover, Recktenwald fails to demonstrate prejudice, *id.* at 694, because it appears that Jury Instruction No. 23A comes close to mirroring the requirements of *Green*. Jury Instruction No. 23A instructs the jury that "if you have a reasonable doubt as to whether the defendant is guilty of sexual assault," then it requires the jury to look at the lesser-included offense of statutory

sexual seduction. ECF No. 80-1 at 32. And even if Jury Instruction No. 23A does not sufficiently match the requirements of *Green*, there is no showing that Jury Instruction No. 23A was an improper statement of law at the time of the trial. Accordingly, an objection to Jury Instruction No. 23A or a request for a different instruction would not have been granted. Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to the transition instruction portion of Ground Seven, Subpart I.

Turning next to Recktenwald's argument that his trial counsel should have sought a mistrial based on the jury's improper verdict, the jury found Recktenwald guilty of all counts of sexual assault and statutory sexual seduction, *see* ECF No. 80-2, which violated Jury Instruction No. 23A's requirement that it "should not find the defendant guilty of both of the above crimes [sexual assault and statutory sexual seduction] on any specific date or specific incident." ECF No. 80-1 at 32. Because the state district court dealt with the verdict issue by setting aside the statutory sexual seduction counts at sentencing, ECF No. 80-11 at 4, it unlikely that the state district court would have entertained a motion for a mistrial had Recktenwald's trial counsel made one. Therefore, Recktenwald cannot show that "the result of the proceeding would have been different" absent any deficient performance. *Strickland*, 466 U.S. at 694.

Finally, turning to Recktenwald's contention that his trial counsel should have requested an instruction regarding several witnesses' drug and alcohol issues, Recktenwald cites to *Champion v. State*, 87 Nev. 542, 490 P.2d 1056 (1971). ECF No. 98 at 36. In *Champion*, the Nevada Supreme Court held that "[w]hen the State adduces testimony by an addict-informer, the

defendant is entitled to careful instructions cautioning the jury of the care which must be taken in weighing such testimony." 87 Nev. at 543, 490 P.2d at 1057. However, none of the witnesses presented at Recktenwald's trial were informers. *See Crowe v. State*, 84 Nev. 358, 366, 441 P.2d 90, 94-95 (1968) (explaining that an informer is someone paid by law enforcement to obtain evidence for convictions), *modified on other grounds by Tellis v. State*, 84 Nev. 587, 590, 445 P.2d 938, 940 (1968). Further, the jury was instructed on witness credibility generally, *see* ECF No. 80-1 at 17 (instructing that "[i]n determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness or accuracy of his or her testimony"), so an additional instruction regarding a witness's credibility as it relates to drug and alcohol issues would have been cumulative. *See Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005) (stating that state district courts in Nevada do not have to accept duplicitous jury instructions). Accordingly, Recktenwald's trial counsel was not deficient in not requesting an informer-addict jury instruction be given. *See Strickland*, 466 U.S. at 688.

Because Recktenwald has not shown this claim of ineffective assistance of trial counsel regarding the failure to move for a mistrial or to request the addict-informer jury instruction to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise these issues. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Therefore, the remainder of Ground Seven, Subpart I is denied as procedurally defaulted.

### 10.    Subpart J

Recktenwald argues that his trial counsel was ineffective for failing to object to the State's sentencing arguments that referenced the bible and religion and allegations that Recktenwald was responsible for turning M.H. into a lesbian. ECF No. 98 at 36. Recktenwald

also asserts that his trial counsel was ineffective for failing to object to the state district court's multiple sentences of life without the possibility of parole, which constituted cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 37. Recktenwald's state habeas appeal focused on Recktenwald's trial counsel's alleged failure to call Recktenwald's son and friends to testify and failure to make significant arguments. *See* ECF No. 46-15 at 7 (holding of the Nevada Supreme Court that "appellant argues that counsel was ineffective at sentencing for failing to call appellant's son and friends as witnesses and for failing to make 'significant arguments' on appellant's behalf"). Accordingly, this Court previously determined that Recktenwald's arguments about his trial counsel's failure to object to the State's sentencing arguments and failure to object to the punishments imposed were unexhausted. ECF No. 111 at 13.

The State made the following comments at the sentencing hearing:

Robert Winthrop, Speaker in the United States House of Representatives, contemporaneous to our Founding Father's said, "Man, in a word, must necessarily be controlled either by a power within them or by a power without them, either by the word of God or by the strong-arm of man. Either by the Bible or by the bayonet."

He can't make it on the outside and the State is asking this Court, using the strong-arm of man to make sure that he never again has the opportunity. His criminal history is nonstop. He's talkin' about the girl in Pennsylvania, Linda. He says he was kissin' her, he was high on drugs. Judge, she was eleven. She hasn't let a man touch her in seventeen years because - - of what he did to her. He wonders why she's a lesbian? She told us. He spooked man right out of her.
. . .

We can't know his heart and we don't need to know his heart. God knows his heart. We need to sentence him regarding his conduct. This Court needs to sentence him regarding his conduct. There was a ruler in Babylon who saw written on the wall, Mene Mene Tekel Parsin. Part of that translation was, you have been weighed. That Ruler was weighed. He's been weighed by the jury. His conduct was found lacking. Judge, the State is requesting that you find this defendant lacking.

You can't sentence him to death as that Ruler was sentenced to death but you can make sure that no other little girl will turn lesbian as he said. I have no idea if that's

true or not. I know that she said she hasn't let a man touch her in seventeen years. Judge, you can make sure that never happens again.

ECF No. 80-11 at 22-24. The state district court then sentenced Recktenwald to eight terms of life with the possibility of parole with an additional eight terms of life without the possibility of parole for the habitual offender enhancements and two terms of 12 to 48 months. ECF No. 80-13 at 5-8.

Recktenwald points to *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2001) for his contention that religious arguments are impermissible. ECF No. 117 at 36. While the Ninth Circuit explained that "religious arguments have been condemned by virtually every federal and state court to consider their challenge," *Sandoval*, 241 F.3d at 777, the context of the religious arguments in *Sandoval* differed from the context here. In *Sandoval*, the State made the religious comments to the jury during the penalty phase of the trial. *See id.* at 775. Here, the State made the comments to the state district court at the sentencing hearing. *See* ECF No. 80-11. Accordingly, the Ninth Circuit's reasoning behind disallowing religious arguments—"that the jury will give less weight to, or perhaps even disregard, the legal instructions given by the trial judge in favor of the asserted higher law," *Sandoval*, 241 F.3d at 776—is inapplicable here. Moreover, Recktenwald opened the door to the State's religious comments when he called the prosecutor the "anti-Christ" and "not a Christian" earlier in the sentencing hearing. ECF No. 80-11 at 21; *see Ybarra v. McDaniel*, 656 F.3d 984, 999 (9th Cir. 2011) (affirming that the Nevada Supreme Court "reasonably determined that most of the statements [made by the State] were invited by the defense's closing argument, which included a lengthy, biblically based argument against the death penalty"). Therefore, because the State's comments were proper, it cannot be

concluded that Recktenwald's trial counsel was ineffective for failing to object to the State's comments about religion and the bible. *See Strickland*, 466 U.S. at 688.

Turning to the State's comment about Baumgartner's sexual orientation, the State was merely commenting on the evidence that had been presented at trial. Indeed, Baumgartner testified at the *Petrocelli* hearing that she was molested at the age of eleven by Recktenwald and that, as a result, she has "never been with a man." ECF No. 80 at 50-51, 56, 58. Additionally, Recktenwald again opened the door to the State's comment by making the following comment earlier in the sentencing hearing: "And they bring a girl from Pennsylvania that's not even a sexual assault case that I was kissin' when we were drunk and under the influence of drugs and she turned lesbian." ECF No. 80-11 at 17, 19; *see generally United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."). Thus, because the State's comment was proper, it cannot be concluded that Recktenwald's trial counsel was ineffective for failing to object. *See Strickland*, 466 U.S. at 688.

Turning finally to Recktenwald's cruel and unusual punishment argument, Recktenwald's sentence was lawfully imposed, so an objection would have been futile. *See* Nev. Rev. Stat. § 200.320; Nev. Rev. Stat. § 200.366. Because an objection would have been futile, Recktenwald's trial counsel was not deficient. *See Strickland*, 466 U.S. at 688. Further, Recktenwald's "conclusory allegation[ ]" in this regard does not warrant habeas relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

In sum, because Recktenwald has not shown this claim of ineffective assistance of trial counsel to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there

is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Therefore,

Ground Seven, Subpart J will be denied as procedurally defaulted.

### 11.    Subpart K

Recktenwald argues that his trial counsel failed to object to the State's improper

argument that denigrated the defense's case. ECF No. 37. In Recktenwald's state habeas appeal,

the Nevada Supreme Court held:

> [A]ppellant argues that counsel was ineffective for failing to object during closing
> argument to the prosecutor's statements that the defense was "wispy vapor trails"
> and "rabbit trails" and to the prosecutor's argument regarding inadmissible
> evidence. In light of appellant's failure to provide the trial transcripts in his
> appendix, he cannot demonstrate a reasonable probability that, but for counsel's
> failure to object, the outcome of the trial would have been different. See Thomas,
> 120 Nev. at 43 & n.4, 83 P.3d at 822 & n.4; Greene, 96 Nev. at 558, 612 P.2d at
> 688. Thus, he fails to demonstrate that the district court erred in denying this claim.

ECF No. 46-15 at 8.

Because this Court already concluded in Ground Five, Subpart E that there was no

prosecutorial misconduct regarding the comments to which Recktenwald takes issue, his trial

counsel was not deficient in not objecting to them. *See Strickland*, 466 U.S. at 688. Therefore,

the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of,

clearly established federal law, as determined by the Supreme Court, and was not based on an

unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This

Court denies Recktenwald habeas corpus relief with respect to Ground Seven, Subpart K.

### 12.    Subpart L

Recktenwald argues that his trial counsel failed to seek the dismissal of the information

before trial or the charges during trial because the information and M.H.'s testimony were so

vague that they failed to adequately apprise him of the nature of the charges. ECF No. 98 at 38.

Specifically, Recktenwald asserts that the last ten counts of sexual assault and statutory sexual seduction simply list a three-week time period and M.H. was unable to relate the number and date of the alleged sexual acts with any particularity. ECF No. 117 at 38. This Court previously determined that the entirety of this subpart was unexhausted. ECF No. 111 at 13.

The Second Amended Information alleged that Recktenwald committed seven counts of sexual assault, six counts of statutory sexual seduction, two counts of possession of a controlled substance, and one count of kidnapping. ECF No. 77-34 at 2-7. The time frame for five counts of sexual assault, five counts of statutory sexual seduction, and the one count of kidnapping was listed as follows: "on or about or between October 1, 1996, and October 22, 1996." *Id.* at 3-7. The Nevada Supreme Court has held that "there is no requirement that the State allege exact dates unless the situation is one in which time is an element of the crime charged. Instead, the State may provide approximate dates on which it is believed that the crime occurred." *Wilson v. State*, 121 Nev. 345, 368-69, 114 P.3d 285, 301 (2005). Because time is not an element of sexual assault, statutory sexual seduction or kidnapping, the three-week time period in the Second Amendment Information was proper under Nevada law. Therefore, because there was no basis for Recktenwald's trial counsel to seek the dismissal of the information, Recktenwald's trial counsel was not deficient. *See Strickland*, 466 U.S. at 688.

With regard to M.H.'s testimony, M.H. did have some difficulties testifying at the trial about dates and the number of times she was sexually assaulted. *See, e.g.*, ECF No. 79-1 (testimony by M.H. that Recktenwald "had sex with me. I don't remember what day it was, what time it was, when it was"). However, Deputy Kelley testified that she interviewed M.H. following the September 1995 events and October 1996 events. ECF No. 79-2 at 16-17, 20. And M.H. was particular in her dates and number of times she was sexually assaulted during those

interviews. *See id.* at 20-21, 27 (M.H. told Deputy Kelley that she had nonconsensual sexual intercourse with Recktenwald twice on September 28, 1995, and September 29, 1995) and at 17 (M.H. told Deputy Kelley that "she had been at Paul's house for about four days and that he had had sex with her approximately fifteen times" and that "seven or eight of them were nonconsensual"). Nevada law "do[es] not require that the victim specify exact number of incidents, but there must be some reliable indicia that the number of acts charged actually occurred." *LaPierre v. State*, 108 Nev. 528, 531, 836 P.2d 56, 58 (1992). Because Deputy Kelley's testimony along with M.H.'s testimony was "reliable indicia" of the number of times Recktenwald sexually abused M.H., Rectenwald's trial counsel was not deficient for not seeking to dismiss the charges at the trial. *See Strickland*, 466 U.S. at 688.

Because Recktenwald has not shown this claim of ineffective assistance of trial counsel to be substantial, he has not shown that his post-conviction counsel was ineffective for failing to raise it. And because Recktenwald's post-conviction counsel was not ineffective, there is no cause for Recktenwald's procedural default. *See Martinez*, 566 U.S. at 9. Therefore, Ground Seven, Subpart L is denied as procedurally defaulted.

### D. Ground Eight and Ground Five, Subpart A

In Ground Eight, Recktenwald argues that his federal constitutional rights were violated when M.H. told the State that she had lied at the first preliminary hearing, but the State failed to disclose that material, exculpatory evidence and presented her false evidence at trial. ECF No. 98 at 39-40. The Respondents argue that M.H.'s change in testimony at the end of the second preliminary hearing and her testimony that the sexual encounters were consensual were unknown to the State. ECF No. 113 at 93-94. The Respondents also assert that the defense was aware of

M.H.'s inconsistent statements and questioned M.H. about those prior statements at both preliminary hearings and the trial. *Id.* at 94.

Connectedly, in Ground Five, Subpart A, Recktenwald argues that the State committed prosecutorial misconduct by failing to withdraw from the case due to a conflict of interest that arose from being a witness to M.H.'s recantation of her accusations. ECF No. 98 at 20-21. Recktenwald also argues that the State was aware that M.H. had told contradictory stories but failed to correct M.H.'s false testimony. *Id.* The Respondents argue that there was no conflict, as there was no evidence that the defense ever attempted to call the prosecutor to testify or that the prosecutor was unable to continue because he was a potential witness. ECF No. 113 at 36. And even if a conflict existed, the Respondents contend that Recktenwald fails to demonstrate that the entire Nye County District Attorney's Office was subject to disqualification. *Id.* at 37.

In Recktenwald's direct state appeal, the Nevada Supreme Court held that they were "not convinced that the incidents cited by [Recktenwald] constitute misconduct." ECF No. 41-22 at 6.

During the first preliminary hearing, which regarded the incidents that occurred during September 1995, held on November 15, 1996, M.H. testified on direct examination that she "didn't want [the sexual intercourse occurrences with Recktenwald] to happen." ECF No. 75-19 at 4-5. During cross-examination, M.H. explained that she had previously recanted her accusations against Recktenwald to Recktenwald's counsel "[b]ecause [her] mom made [her]." *Id.* at 10. M.H. also called Recktenwald's probation officer and the Nye County District Attorney's Office to inform them that the accusations against Recktenwald were not true "[b]ecause [her] mom made [her]. It was either that or [her mom] was going to kick [her] out." *Id.* at 10-11. M.H. then slightly varied her previous testimony by explaining that she did not consent to the sexual contact with Recktenwald except for on one occasion. *Id.* at 12.

During the second preliminary hearing, which regarded the incidents that occurred during October 1996, held on December 6, 1996, M.H. testified on direct examination that she did not want to have sexual intercourse with Recktenwald. ECF No. 75-25 at 5, 8-9. M.H. explained that she "let him do it, but [she] didn't want him to do it, but [she] didn't fight him because he was going to do it anyways." *Id.* at 12. On cross examination, M.H. testified that she "told him that [she] didn't want to, but he did anyways" and she "just let him do it, because he was going to do it anyways." *Id.* at 120, 126. However, later during re-cross examination, M.H. answered in the affirmative when asked if she willingly had sexual intercourse with Recktenwald. *Id.* at 136-37. M.H. explained that she the sexual intercourse between her and Recktenwald was consensual every time in October 1996, except when he penetrated her with a Pepsi bottle, and every time in September 1995. *Id.* at 137-38. Finally, when questioned about the first time she had sexual intercourse with Recktenwald, M.H. stated that "[i]n a way [she] did [want to have sex with Recktenwald], but in a way [she] didn't" and eventually gave in. *Id.* at 138-39.

M.H. later testified at the trial that she gave a note, later identified at trial as "Exhibit Number J," to the Nye County District Attorney's Office during the second preliminary hearing. ECF No. 79-1 at 41-42. The note stated: "My family made me lie about Paul because they don't like him because of his charges in the past with another person and because of how old he is." ECF No. 85-8 at 2.

Recktenwald's original trial counsel filed a motion to disqualify the Nye County District Attorney's Office and a corresponding affidavit on December 30, 1996, explaining that M.H. told him during a break in the second preliminary hearing that "she had told [the State that she had lied under oath] and he advised her that the State had no intention of prosecuting her for her

false testimony" and that the State "'made her'" testify. ECF No. 76-1 at 13. In response, the

State explained:

> The State has notified the defense every time it has come to our attention that the victim has been inconsistent or has admitted being untruthful.
>
> The State provided to the defense the victim's case worker in California who told the State about the victim's inconsistency, and emotional state, and suicidal tendencies. The State provided the names of the suspect's parole officer who had information about the victim telling inconsistent versions of the facts. The defense has a litany of witnesses from the Defendant himself who can testify regarding the victim's different stories. The State provided to the defense the note presented as an exhibit in the defense brief as soon as we got it. The State is the one who told the victim to "just tell the truth" when, upon cross examination, she, for the first time under oath, told the court that all the sexual encounters were consensual. When the victim relayed that she had told some lies to the police, that information was immediately relayed to the defense.
>
> All the Sate ever did to "make" her testify was to give her a subpoena and request her to tell the truth.
>
> The victim never told the State that she was not raped until she said it on the stand during cross-examination.

ECF No. 76-4 at 3-4. The state district court denied the motion to disqualify the Nye County

District Attorney's Office. ECF No. 76-6 at 3.

Recktenwald first alleges that the State violated *Brady v. Maryland* when it failed to

notify him prior to the second preliminary hearing that M.H. had informed the State that she had

lied at the first preliminary hearing. In *Brady*, the Court held that "the suppression by the

prosecutor of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of

the prosecution." 373 U.S. 83, 87 (1963); *see also United States v. Blanco*, 392 F.3d 382, 387

(9th Cir. 2004) ("Impeachment evidence is exculpatory evidence within the meaning of *Brady*.").

"There are three components of a true *Brady* violation: The evidence at issue must be favorable

to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

Evidence that M.H. allegedly recanted her first preliminary hearing testimony to the State is certainly favorable to Recktenwald. *See Strickler*, 527 U.S. at 281-82. However, it is unclear whether the State actually suppressed any evidence, and even if the State did suppress this evidence, it cannot be concluded that prejudice ensued. *See id.* The only evidence supporting the allegation that M.H. recanted her first preliminary hearing testimony to the State is M.H.'s statement to Recktenwald's original trial. *See* ECF No. 76-1 at 13. Contrarily, the State maintained that it "notified the defense every time it ha[d] come to [its] attention that the victim ha[d] been inconsistent or ha[d] admitted being untruthful." ECF No. 76-4 at 3; *see also* ECF No. 79 at 104-05 (testimony of M.H. at trial that she was did not "remember nothing [sic] that [she] said or they asked me at the preliminary hearing" and that she was "high on speed at the preliminary hearing on December the 6th, 1996"). And importantly, even if this alleged recantation exists, it is not material. Evidence is only material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different." *Bagley*, 473 U.S. at 682. However, even if the State had informed Recktenwald about the alleged recantation before the second preliminary hearing, the result of the second preliminary hearing would have been the same. Indeed, during the second preliminary hearing, M.H. recanted her first preliminary hearing testimony that the sexual encounters with Recktenwald in September 1995 were nonconsensual. *See* ECF No. 75-25 at 138 (testimony by M.H. that the sexual intercourse between her and Recktenwald was consensual every time in September 1995).

Turning to Recktenwald's next assertion that the State admitted false testimony at trial, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This rule applies "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears" and when "the false testimony goes only to the credibility of the witness." *Id.* A *Napue* violation claim will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotation marks and alternation omitted). "[A] *Napue* violation requires that the conviction be set aside whenever there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (quoting *Hayes*, 399 F.3d at 985).

Here, M.H. originally maintained that the sexual encounters with Recktenwald were not consensual. *See generally* ECF No. 75-18. Then, prior to the first preliminary hearing, M.H. called the Nye County District Attorney's Office, Recktenwald's probation officer, and Recktenwald's original counsel to inform them that she was recanting her accusations. *See* ECF

No. 75-19 at 10-11. At the first preliminary hearing, M.H. again maintained that the sexual

encounters were not consensual. *Id.* at 5. After the first preliminary hearing, M.H. allegedly told

the State that she had lied at the first preliminary hearing, indicating that the sexual encounters

were consensual. *See* ECF No. 76-1 at 13. At the second preliminary hearing, M.H. once again

maintained that the sexual encounters were not consensual, but at the end of that hearing, M.H.

changed her testimony, explaining that besides one instance, the sexual encounters were

consensual. *See* ECF No. 75-25 at 8-9, 136-39. Accordingly, by presenting M.H.'s testimony at

the trial that the sexual encounters were not consensual, it is not clear that the State presented

evidence that was "actually false." *Hayes*, 399 F.3d at 984. Rather, the State informed the jury

that M.H. had vacillated on whether the sexual encounters were consensual or not and left it to

the jury as the fact-finder to determine what version of M.H.'s story was true. *See* ECF No. 78-1

at 34 (comment by the State during its open statement that M.H. "has said that she was raped and

she has said it was consensual. She has never wavered, not once, on whether or not there was

innercourse [sic]"). Therefore, Recktenwald's contentions that the State presented false

testimony at trial and failed to correct M.H.'s false testimony are meritless.

Turning finally to Recktenwald's assertion that the State should have withdrawn from the

case due to a conflict of interest, it is not clear that a conflict even exists. First, M.H. testified that

when she called the Nye County District Attorney's Office prior to the first preliminary hearing

to recant her accusations, she did not remember who she spoke to, did not remember whether she

spoke to a man or a woman, did not ask to speak to anyone in particular, and was not referred to

anybody else within the office. ECF No. 75-19 at 11. Second, as explained previously, the only

evidence supporting the allegation that M.H. recanted her first preliminary hearing testimony to

the prosecutor is M.H.'s statement to Recktenwald's original trial. *See* ECF No. 76-1 at 13.

Moreover, this Court is unaware of any Supreme Court decision holding that a prosecutor must disqualify himself or herself due to discussing a recantation with a witness. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (where no decision of the Supreme Court squarely addresses an issue in a habeas case, "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established federal law" to warrant habeas relief under 28 U.S.C. § 2254).

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). This Court denies Recktenwald habeas corpus relief with respect to Ground Eight and Ground Five, Subpart A.

## V.  CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). Applying this standard, this Court denies Recktenwald a certificate of appealability.

//

//

//

# VI.     CONCLUSION

IT IS THEREFORE ORDERED that the Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254D1 (ECF No. 98) is DENIED.

IT IS FURTHER ORDERED that Recktenwald is denied a certificate of appealability.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Isidro Baca for Dwight Neven as the Respondent warden on the docket for this case.

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment accordingly.

DATED: April 29, 2021.

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE